PATTERSON, Judge.
The appellant, Mac O’Neal Lawhorn, was indicted, by the March 1989 term of the Talladega County grand jury, for the capital offense of murder of William Clarence Berry pursuant to a contract for hire, with Altion Maxine Walker, consideration being $40. Ala.Code 1975, § 13A-5-40(a)(7). On June 23, 1989, a jury returned a verdict of guilty as charged. A sentencing hearing was conducted, in accordance with §§ 13A-5-45 and -46, and the jury returned an advisory verdict, based on a vote of 11 to 1, recommending to the trial court that the penalty be life imprisonment without the possibility of parole. On July 6, 1989, the trial court held a sentencing hearing, in compliance with § 13A-5-47, and fixed appellant’s punishment at life imprisonment without the possibility of parole. In its sentencing order, the trial court noted that it could understand the jury’s recommendation, considering appellant’s age at the time of the crime (18 years old) and the testimony indicating that appellant’s “intelligence was borderline, and that he might be considered in ‘the twilight zone’ of mental capability.”
The prosecution presented the following evidence:
On March 31, 1988, a man driving an automobile, later identified as belonging to the victim, was seen following a truck driven by a woman and later identified as belonging to appellant’s aunt Altion Maxine Walker. The vehicles stopped at a store on Highway 148, about one-half mile from Wiregrass Road. After the drivers bought sodas from a machine located outside the store, both got into the truck and drove away. The owner of the store saw the automobile parked at the store at 3:30 or 4:00 that afternoon, and it remained there until April 2, when it was towed away by police officers.
At approximately 4:00 p.m. on March 31, a man, on Wiregrass Road, observed a truck, which resembled Walker’s. He observed three people sitting on the front seat. The two sitting on the driver’s side were “fairly young” men with beards.
Between 6:00 p.m. and 6:15 p.m. on March 31, one of appellant’s neighbors, who was on his way home from work, picked appellant up about one-half mile from appellant’s house and gave him a ride home. Later, appellant went with his mother, his step-sister Vicki Bates, and his step-cousin Denise Bates, to get some carry-out food. When they returned, appellant’s brother Charles Lawhorn and Walker were there. Appellant stayed outside with them for awhile after the others went inside.
On April 1, Walker cashed an $800 check drawn from the account “Maxine Walker, for Children of F.L. Walker” at the First National Bank of Sylacauga. On that same date, she deposited $600 of those funds to her account and kept $200 in cash. (The above information was established by bank records.)
On April 2, at approximately noon, a hunter discovered the body of the victim, William Clarence Berry, in a wooded area about 65 to 70 feet off Wiregrass Road.
That night, appellant told Denise Bates that he shot a man and that he did it for somebody.
An autopsy was performed on the body of the 46-year-old victim on April 3. The autopsy revealed seven abrasions on the forehead and 27 gunshot wounds, 16 of which were entrance wounds and 11 of which were exit wounds. Gunshot from a pistol or a rifle caused four wounds: one entering the left side of the neck; one entering the chin, which went into the brain, causing death instantly; and two *972 entering the left side of the chest, one of which severed the spine and spinal cord, also causing death instantly. The remaining wounds were caused by a shotgun. These wounds had been inflicted first. They were to both arms, the upper abdomen, the right side of the chest, the right leg, and the right upper back. The wounds from either weapon would have been fatal. The cause of death was “multiple gunshot and shotgun wounds.”
On the night of April 2 and on April 3 and 4, officers seized, from Walker’s residence, a FIE brand 12-gauge single-barrel shotgun, a Winchester Super Double “X” Magnum .00 buck 12-gauge shell, and an empty box for Winchester 12-gauge Double “X” three-inch Magnum copper-plated .00 buckshot shells. A box of Winchester Super-X .25 caliber ammunition was retrieved from under a shed behind the residence. Parts of a black box were found near a woodpile and several feet behind the residence, and papers for the operation of a Titan .25 caliber pistol were found at the edge of the woodpile. A Titan .25 caliber semi-automatic pistol was found in the driveway area.
The 12-gauge shotgun was compared with three spent shotgun shells: a 12-gauge .00 buckshot shell, a Magnum Double “X” shell, and an Activ shell. The first two had been recovered on Wiregrass Road near the scene, and the other had been found a quarter-mile from the scene toward Sylacauga. Although each shell had the same class characteristics, the firearms expert was unable to conclude that the spent shells had been fired from that particular gun. However, he did determine that the three .25 caliber spent projectiles recovered from Berry's body and a spent .25 caliber cartridge found at the scene had been fired by the pistol found in Walker’s driveway. Shotgun pellets and pellet fragments recovered from the body, pellets removed from the ground at the scene, and one pellet removed from a tree at the scene were all copper-plated .00 buckshot.
A fingerprint expert determined that a latent print lifted from the exterior of the passenger door of Walker’s truck was that of Charles Lawhorn. She also determined that a latent print lifted from the bottom of the box of Winchester shells found under Walker’s shed was that of Walker.
On April 5, appellant asked Denise Bates to tell his friend Kenny Williams to say that appellant had been with him from 2:30 p.m. to 5:15 p.m. on March 31. (However, at trial, Williams testified that he did not see appellant on March 31 until approximately 7:00 p.m.) Also on April 5, Sheriff Jerry Studdard saw appellant at his residence and observed a red spot on his shoulder and a couple of blue bruises on his arm.
On the morning of April 7, appellant showed up at the sheriff’s office in Syla-cauga. Investigator Frankie Wallis, in the presence of Lieutenant Alvin Kidd, advised appellant of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), at 8:25 a.m. Appellant signed a waiver form, acknowledged that he understood those rights, and stated that he wished to talk. No one threatened him, promised him anything, or induced him in any way to make a statement. The conversation at this time lasted 45 minutes.
Sometime after midmorning, appellant was transported to the Talladega County jail. Just prior to lunch, appellant was again advised, by Wallis, of his Miranda rights; he acknowledged his understanding of them; he signed a waiver form; and he stated that he wished to talk. Again, no one threatened him or induced him to make a statement. Wallis was continuously present; Studdard, Kidd, and Ann Wallace were present in intervals. During this time, breaks were taken and topics other than the Berry murder were discussed. Wallis also offered to get lunch for appellant, but he declined. Wallace arrived at approximately 12:45 p.m. During this time, appellant stated that, on March 31, his brother had come by Mike Big ’O, where he was playing pool, and had asked him if he wanted to go to Sylacauga to make money hauling blocks; that they went to Sylacauga, but there was no job; and that he went home. He further *973 claimed that he had been with Kenny Williams that afternoon.
At 1:55 p.m., when Wallis, Wallace, and Kidd were present, appellant indicated that he would tell what happened. However, he stated that he would not talk “in the tape machine” or write out and sign a statement. He did allow Wallace to write his statement as he talked; but he would not sign the statement.
In his statement, appellant related the following: When he saw Charles and Walker, who were in Walker’s truck, Charles asked him “did he want to go to a job with him,” but he did not say what kind of job. On their way to Sylacauga, Charles asked “if [he] wanted to do a job with him and make some money.” Charles showed him a little pistol with a brown handle. As they got closer to Sylacauga, Walker, who was driving, told him to lie down in the back seat. They stopped at Walker’s son’s place of employment and, while appellant was still hiding, Charles and Walker got a shotgun. Charles and Walker mentioned “something about going to do something to a dude.” After they left there, “something was said about making dude leave her alone.” When Walker stopped the truck again, they were in the woods. They got out, and Charles had the pistol in his pocket and a shotgun. Walker stayed a little while and left, saying she would be back. Charles and appellant stayed in the woods.
Then, appellant continued his statement, as follows:
“Maxine [Walker] came back. Somebody, a man was with her. They stopped, and this dude got out and took off running like a bat out of hell. I guess he saw us. He had to_ We got in the back of the truck and went up the road and passed him, and he was still running. Mackie [Walker] was still driving the truck. Charles give me the shotgun then, and he said, ‘Shoot him.’ I shot at him. Dude ducked down and fell, and he got up and started running through the woods, and ... we was still in the back of the truck. Mackie was still driving the truck. I gave the shotgun to Charles. I put it down and said, ‘I wasn’t ... fucking with it any more.[’] Charles shot the shotgun once, I think. Mackie stopped the truck, ... and Charles asked me to finish him off, and I told him, ‘I wasn’t fucking with it.’ I told him, ‘You started it. You finish it.’ After guy was up in the woods, he fell, and Charles walked up there to him. Charles shot him a couple of times with the pistol. The man was laying there when we left. The shotgun was a single shot.... The shotgun was loaded when it was give to me. We were in the woods one hour to hour and a half. After we shot him, I told her to take me back. [After dropping Charles off in Sylacau-ga, m]e and Mackie went to Alex City. Mackie drove. Aunt Mackie give me the pistol when I got out of her truck. I was going to get rid of the pistol, and they called me on the phone and said they needed it. Aunt Mackie didn't give me no money that night.... Around ten minutes until six, she let me out three miles from the house on Choley Creek Road. When I got out of truck, shotgun was still in truck. I went on home. Mama and Vicki was there. When I got close to home, I got a ride with Phillip Woodruff to my house. Denise, my cousin, come up to the house. I throwed it, put it out in the woods. It was already in a sack and wrapped with a piece of tinfoil around it. Me and mama and them went and got something to eat. Got a phone call before we left from Charles_ He wanted the gun. When we got back from getting something to eat, Charles and Mackie was in my yard_ Charles went and got gun_ Next time I saw Charles was Friday, sometime before 1:30 p.m. Mackie dropped him off, Charles. I was standing on front porch. Charles gave me forty bucks. He didn’t say what it was for.... On way to Sylacauga Thursday, I had a pretty good idea what Charles and Mackie was talking about when they was talking about the job. Mackie had said she wanted the dude shut up. After that, she told me to lay down in the seat. On way, Charles told me I was going to have to stay out of the sight because we *974 had a job to do. When dude run, Charles said, ‘Come on.’ I shot dude from the back of the truck.”
Appellant did not testify or call any witnesses on his behalf.[1]
I
Appellant contends that the trial court erred in denying his motion for judgment of acquittal entered at the end of the prosecution’s case because, he argues, the prosecutor never established that he had been hired to kill Berry or that he experienced any pecuniary gain for his participation in the murder. He also contends that his intent to kill was not proven since the evidence established that he only shot once and offered no indication that this shot would have caused a fatal injury.
This argument ignores the application of § 13A-2-23(2), which states that “[a] person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense ... [h]e aids or abets such other person in committing the offense.” “Any words or acts of a person which contribute to the commission of a crime, which are intended to incite or encourage the commission of that crime, make that person liable for that crime as a principal.” Graham v. State, 494 So.2d 916, 921 (Ala.Cr.App.1986). As indicated by his admission that he “had a pretty good idea what Charles and Mackie was talking about when they was talking about the job,” appellant acted, with the intent to kill for hire, when he took the loaded shotgun from Charles, with the knowledge that it was loaded, aimed and shot Berry; gave the shotgun back to his brother; and told his brother to “finish it.” In addition, after the murder, appellant took the pistol from Walker to get rid of it; took $40 from Charles after Charles had asked him, prior to the murder, if he “wanted to do a job with him and make some money”; secured Williams to provide a false alibi for him; and gave false statements to the police.
The evidence supports the reasonable inference that appellant was hired and received payment for his active participation in the murder. See also Tomlin v. State, 443 So.2d 47, 52-53 (Ala.Cr.App.1979), aff'd, 443 So.2d 59, 64 (Ala.1983), cert. denied, 466 U.S. 954, 104 S.Ct. 2160, 80 L.Ed.2d 545 (1984). The evidence also establishes his intent. “If a person voluntarily or willfully does an act which has a direct tendency to destroy another’s life, the natural and necessary conclusion from the act is that he intended so to destroy such person’s life.” 40 C.J.S. Homicide § 17 (1944) (footnote omitted). In Graham v. State, 494 So.2d at 921, the court reviewed the , evidence that Graham had given her gun to her co-defendant at his express request and with his proclamation that he was going to shoot the victim. In upholding her conviction as resting on sufficient evidence, the court stated the following:
“Appellant Graham’s act of giving the gun to Ward with the knowledge that he intended to kill the victim is an act which is clearly intended to encourage the commission of the victim’s murder. She assisted appellant Ward in the victim’s murder by giving him the gun knowing Ward had stated he was going to use it to kill the victim. Appellant Graham aided and abetted appellant Ward in the commission of the victim’s murder. Thus, she is equally as liable for that murder.”
Id. See also Lee v. State, 51 Ala.App. 332, 285 So.2d 495, cert. denied, 291 Ala. 787, 285 So.2d 500 (1973). Moreover, we hold that appellant’s refusal to continue shooting does not remove him from the operation of § 13A-2-23(2). See § 13A-2-24(3).
The trial court’s denial of appellant’s motion for judgment of acquittal was proper.
*975 II
We have reviewed appellant’s remaining contentions and find that they do not warrant discussion. His issue that the trial court erred in allowing witnesses Wallace and Wallis to read, into evidence, Wallace’s notes taken when he confessed is without merit. His contention that the prosecution failed to produce Wallace’s notes of his statement is procedurally barred and is without merit. His final issue of whether the trial court erroneously denied his motion to suppress his confession on the grounds that it was involuntary and the product of an illegal arrest is without merit.
Accordingly, the judgment of the circuit court is hereby affirmed.
AFFIRMED.
All Judges concur.

. Prior to the instant trial, Altion Maxine Walker and James Charles Lawhorn were convicted, in separate trials, of the capital offense of murder for hire and sentenced to death. Walker’s appeal is awaiting submission to this court (7 Div. 164), and Charles Lawhorn’s conviction and sentence have been affirmed by this court. (Ms. 7 Div. 281, September 21, 1990).