**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Michael DANIELS, Defendant–Appellant.**

**No. 94–3705.**

United States Court of Appeals,
Seventh Circuit.

Argued May 12, 1995.

Decided Aug. 28, 1995.

Stephen J. Liccione, Asst. U.S. Atty., Michelle Leslie (argued), Office of the U.S. Atty., Milwaukee, WI, for U.S.

D. Michael Guerin (argued), Gimbel, Reilly, Guerin & Brown, Milwaukee, WI, for Michael Daniels.

Before BAUER, MANION, and KANNE, Circuit Judges.

BAUER, Circuit Judge.

Michael Daniels' first trial for bank robbery and the use of a firearm in connection with a crime of violence ended with a hung

jury. He was not that lucky the next time around; the second jury convicted him on both counts. Daniels now contests several aspects of his prosecution. Finding no grounds on which to reverse his conviction, we affirm.

Daniels robbed the Great Midwest Bank in Bayside, Wisconsin, on January 29, 1994. He demanded and received money from two tellers, Mary Grace Maglio and Allison Schumer, at different windows. After issuing several expletive-laced threats, Daniels herded all the tellers into a corner at gunpoint and escaped. This is the robbery for which Daniels was convicted.

Much of this case, however, concerns the investigation of an armed robbery of the Kilbourn State Bank in Milwaukee, Wisconsin, on March 7, 1994. Three bank employees and two customers witnessed that robbery. On March 18, 1994, Milwaukee police showed an array of five color photographs to the bank employees. Two selected a photograph of Daniels, but could not be sure that the man in the photograph was the robber without seeing him in person; the third employee could not identify the robber in any of the pictures. On March 22, 1994, Milwaukee police showed the same photo array to the bank customers, Carol and William Zautke. Carol selected a photograph of Daniels, but could not be sure that he was the robber without seeing him in person; William pointed out a photograph of a different person as most resembling the robber.

On March 23, 1994, at 4:40 p.m., Milwaukee police arrested Daniels for the Kilbourn State Bank robbery, without a warrant, based on the eyewitnesses' identifications from the photographic arrays and on a statement from a confidential informant that Daniels had committed two unsolved bank robberies. The next evening at 7:45 p.m., Daniels participated in a line-up with four other black males, all wearing knit caps, that was viewed by the witnesses to the Kilbourn State Bank robbery. William Zautke stated that he recognized Daniels as the robber by his size, build, and the wearing of a knit cap. He also stated that he was positive that Daniels committed the crime because the two men were about ten feet from one another as Daniels fled the bank. None of the other four witnesses could positively identify any member of the line-up as the robber.

On March 25, 1994, at around 9:00 a.m., Milwaukee County Court Commissioner Draper found probable cause to believe that Daniels committed the Kilbourn State Bank robbery based upon a Milwaukee County "Uniform Arrest–Detention Report" dated March 23, 1994, containing the sworn statement of Officer Gil Ewer. Ewer averred that two unnamed witnesses identified Daniels from a photo array that included Daniels' picture. He further stated that another unnamed witness "positively" identified Daniels from a photo array.

On March 26, 1994, FBI Special Agent Matthew Gibson showed photographs of the March 24, 1994, line-up to Mary Grace Maglio regarding the Great Midwest Bank robbery. Maglio identified Daniels as the possible robber, but could not be sure without seeing him in person. On March 28, 1994, Daniels participated in a second line-up with four other black males. Both Maglio and Schumer positively identified Daniels as the robber of the Great Midwest Bank.

For the sake of clarity, we note that Daniels was originally arrested for the Kilbourn State Bank robbery. At the first line-up in which Daniels participated, none of the three witnesses who picked Daniels' photograph out of a photo array could positively identify him as the robber. William Zautke, however, positively identified Daniels. As that investigation progressed, the police began to suspect Daniels of the Great Midwest Bank robbery. This suspicion was crystallized when the two tellers from the Great Midwest Bank positively identified Daniels in another line-up. He was ultimately convicted of the latter crime.

■ Daniels' claims stem from the circumstances surrounding his arrest, his initial detention, the line-ups in which he participated, and evidentiary rulings in his second trial. First, he claims that he failed to receive a timely judicial determination of probable cause to support his arrest, commonly referred to as a *Gerstein* hearing. "A jurisdiction that provides judicial determinations of

probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement...." *County of Riverside v. McLaughlin,* 500 U.S. 44, 56, 111 S.Ct. 1661, 1670, 114 L.Ed.2d 49 (1991). Because Daniels received his hearing within forty hours of arrest, we presume he received a timely hearing. Daniels can refute this presumption and demonstrate that he did not receive a timely hearing if he "can prove that his ... probable cause determination was delayed unreasonably." *Id.* Daniels argues that because the police conducted another line-up while Daniels was in their custody, they were collecting evidence to justify his arrest and therefore delayed his *Gerstein* hearing unreasonably. He misapprehends the circumstances of his detention and the applicable precedent.

■ The line-up of March 24, 1994, was not conducted to justify Daniels' arrest; it was done to collect more evidence against Daniels. Ewer's affidavit stated that probable cause to arrest Daniels was based on the identification of two unnamed witnesses of a photo array containing Daniels' picture and the "positive" identification of another unnamed witness. The result of that line-up did not appear in Ewer's affidavit to justify probable cause because it was conducted after Ewer's affidavit was taken on March 23. Daniels' argument seems to interpret *Riverside* to preclude law enforcement from bolstering its case against a defendant while he awaits his *Gerstein* hearing; that is a ludicrous position. *Gerstein* and its progeny simply prohibit law enforcement from detaining a defendant to gather evidence to justify his arrest, which is a wholly different matter. Probable cause to arrest Daniels already existed and that is what Ewer's affidavit reported. We therefore reject Daniels' contention that he did not receive a prompt *Gerstein* hearing.

■ Daniels' next complaint is somewhat novel. He claims his constitutional rights were violated when Commissioner Draper considered only the contents of Ewer's affidavit without being apprised of the line-up developments of the previous evening. That is, Daniels argues that Draper should have been told that none of the three witnesses named in Ewer's affidavit could pick Daniels out of a line-up. He casts this violation as one of the type articulated in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

In *Franks,* the Supreme Court addressed a defendant's challenge to affidavits supporting an *ex parte* grant of a search warrant. It held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* at 155–56, 98 S.Ct. at 2676–77. This court has held that *Franks* applies to arrest warrants as well. *Olson v. Tyler,* 771 F.2d 277, 281 n. 5 (7th Cir.1985), and 825 F.2d 1116, 1119 (7th Cir.1987) (same case).

This, however, is not such a case; Daniels was arrested without a warrant. Moreover, there are no false or misleading statements made by the affiant Ewer in his affidavit. This is simply a case of the prosecution failing to furnish all relevant information to the neutral and detached magistrate charged with determining probable cause, as required by *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Consequently, we believe that Daniels' claim is properly characterized as a failure to afford a proper *Gerstein* hearing. That is, although Commissioner Draper conducted a hearing, it was done so *pro forma,* without all the facts regarding Daniels' detention at that time. Notwithstanding any lack of either candor or diligence on the part of the prosecution, Daniels has not stated a legitimate claim.

■ Even if we view this failure to reveal certain information to Draper as an outright refusal to afford Daniels a *Gerstein* hearing, his claim fails. A failure to conduct a proper *Gerstein* hearing or even a refusal to conduct one does not invalidate an otherwise valid conviction. As the Court in *Gerstein,* 420 U.S. at 119, 95 S.Ct. at 866, stated: "[A]lthough a suspect who is presently detained may challenge the probable cause for that

confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause." There is no question here that Daniels' conviction is amply supported by the government's evidence. Consequently, regardless of whatever error may have been committed regarding Daniels' hearing before Commissioner Draper, the law does not afford Daniels the sort of relief he seeks regarding the appeal of his conviction.

■ Moving to Daniels' other arguments, he claims that the line-up of March 28, 1994, at which both Maglio and Schumer positively identified Daniels was overly suggestive. The district court held that the line-up was not suggestive. To prevail, Daniels "must first establish that the identification procedure was unnecessarily suggestive. If the defendant satisfies this burden, the court considers whether, viewed under the totality of the circumstances, the identification is reliable despite the suggestive procedures." *United States v. Sleet,* 54 F.3d 303, 309 (7th Cir.1995) (citations omitted).

■ Daniels essentially claims that the suggestive nature of the line-up derives from the circumstance that he was the only participant in the line-up that resembled himself. The line-up consisted entirely of black men of varying heights, skin tones, and facial features. It appears that Daniels is arguing for a rule requiring law enforcement to obtain line-up participants that bear almost a familial resemblance to the defendant to better increase his odds of evading identification. Even if he is not, Daniels does not identify any specific suggestive characteristics of this line-up, which renders his claim dubious.

We believe the identification to have been reliable. Maglio and Schumer are the two people who got the best look at Daniels during the Great Midwest Bank robbery; they were standing just a few feet from him and looking right at him for a matter of minutes. Daniels dallied during that robbery to wave his gun and threaten his hostages. These two women got a good look at Daniels and unequivocally identified him in the line-up and again at trial. Even if the line-up

was suggestive, their identification of Daniels was reliable.

With respect to his trial, Daniels claims that the district court erred when it denied his *ex parte* motion for the appointment of an expert to serve as a witness, pursuant to 18 U.S.C. § 3006A(e), without a hearing. That section states:

> Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for an adequate defense may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court ... shall authorize counsel to obtain the services.

He claims that the statute requires a hearing and that such an expert was necessary to prepare his defense. He is wrong on both counts.

■ A defendant is not entitled to a hearing when he does not make even the barest of cases that an expert is necessary to his defense. *United States v. Goodwin,* 770 F.2d 631, 634 (7th Cir.1985). Daniels requested the appointment of an eyewitness expert. "Expert testimony regarding the potential hazards of eyewitness identifications ... will not aid the jury because it addresses an issue of which the jury already generally is aware, and it will not contribute to their understanding of the particular factual issues posed." *United States v. Larkin,* 978 F.2d 964, 971 (7th Cir.1992) (citations and internal quotation marks omitted). *See also United States v. Hudson,* 884 F.2d 1016, 1024 (7th Cir.1989); *United States v. Smith,* 869 F.2d 348, 351–52 n. 4 (7th Cir.1989).

■ We review the decision to deny a defendant's motion for the appointment of an expert for an abuse of discretion. *Goodwin,* 770 F.2d at 635. Obviously, it follows that if we do not permit eyewitness expert testimony, such testimony is not necessary for Daniels' defense. The district court therefore properly exercised its discretion in denying Daniels' motion for the appointment of an eyewitness expert.

Finally, Daniels claims that the district court erred when it permitted the testimony of an automobile dealer who sold a car to Daniels on March 7, 1994, for $7,900 in cash. Daniels claims that this testimony was irrelevant. We review such a decision by the district court for an abuse of discretion. *See, e.g., United States v. Johnson–Dix,* 54 F.3d 1295, 1303 (7th Cir.1995).

The evidence showed that Daniels was and remains a man of very limited means. This testimony was offered to prove that Daniels had a large amount of cash in denominations consistent with the stolen money from the Great Midwest Bank. It was not irrelevant, and therefore, was properly admitted.

For the foregoing reasons, Daniels conviction is

AFFIRMED.