**James E. RINEY, Jr., Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–5888.

Court of Appeals of Alaska.

April 11, 1997.

---

Jill E. Farrell, Assistant Public Defender, and John B. Salemi, Public Defender, Anchorage, for Appellant.

William H. Hawley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

### OPINION

MANNHEIMER, Judge.

James E. Riney, Jr., appeals his conviction for fourth-degree misconduct involving a controlled substance (possession of three small "rocks" of cocaine), AS 11.71.040(a). One of the main issues on appeal is whether the police violated Riney's right to a speedy initial appearance when they took him to the police station following his arrest and held him for two hours before taking him to the magistrate. Riney contends that he was prejudiced by this delay because he submitted to police questioning while he was at the station and gave statements that were later used against him.

This speedy-first-appearance issue is entwined with a separate search-and-seizure issue that Riney presents on appeal. In the superior court, the government asserted that Riney's cocaine had been found during a search of Riney's person at the time (and location) of his arrest. Riney disputed this; he asserted that he had been arrested, taken to the police station, and then searched—and that the police had planted the cocaine on him during that search.

In addition, the speedy-first-appearance issue and the search-and-seizure issue are entwined with a destruction or loss of evidence claim. The police taped their station-house interviews of both Riney and his co-defendant, Lloyd Stevenson. The tape of Riney's interrogation was produced during pre-trial discovery, but the police were unable to locate the tape of Stevenson's interrogation. Riney asserts that the tape of the Stevenson interview might have contained statements indicating that the cocaine was "found" on Riney's person when he was searched at the police station—thus corroborating Riney's claim that he possessed no cocaine until the police planted the drug on him.

Finally, Riney challenges two of the occurrences at his trial. He asserts that the prosecuting attorney misstated the law during her rebuttal argument to the jury. He also asserts that the trial judge should have instructed the jury that, because the State had lost the tape of Riney's station-house interrogation, the jurors should assume that the tape would have been favorable to Riney.

For the reasons explained in the following opinion, we conclude that Riney's conviction should be affirmed.

### Underlying facts

On the evening of January 20, 1995, Anchorage Police Department Officer Leslie Herring was working undercover on Fourth Avenue, attempting to "make some street-level [purchases]" of marijuana. Around 9:00, Herring encountered Riney. Herring told Riney that she was looking for some "grass". Riney consulted his partner, Lloyd Stevenson. Stevenson produced a package wrapped in plastic that appeared to contain marijuana. Stevenson handed the package to Herring, and Herring handed two ten-dollar bills to Riney.

As Herring walked away from this purchase, she signaled to her back-up officer, William C. Webster, that the transaction was completed. Herring and Webster arrested Stevenson. Meanwhile, another officer, Ronald T. Robinson, was arriving at the scene. After assisting briefly in the arrest of Stevenson, Robinson proceeded to apprehend Riney.

Both Stevenson and Riney were taken to the Fairview substation. Approximately two hours later, Riney was taken to the courthouse for his initial appearance.

### Where and when did the search take place?

Following his indictment, Riney asked the superior court to suppress the cocaine. He claimed that the cocaine had been found during a search conducted at the station house, and he further claimed that he was taken to the station house (rather than the courthouse) in violation of his right to a speedy initial appearance under the Fourth Amendment and under Alaska Criminal Rule

5(a)(1). Riney therefore asked the superior court to rule that the station-house search was illegal, and that anything found during that search should be suppressed.

After holding a hearing to establish the facts of the search, Superior Court Judge Mark C. Rowland found that the search had actually occurred on Fourth Avenue at the time of Riney's arrest, and not later at the station house as Riney claimed. This finding of fact meant that Riney's speedy-initial-appearance claim was moot (at least with regard to whether the cocaine should be suppressed), since any unreasonable delay in taking Riney to the magistrate had not affected the police officers' discovery of the cocaine.

On appeal, Riney argues that Judge Rowland's finding is clearly erroneous. He points to various witness statements tending to show that the search occurred at the station house, not on Fourth Avenue. For instance, during Riney's initial appearance in front of the magistrate, Officer Webster told the magistrate, "We arrested both [Riney and Stevenson], and we brought Mr. Riney back to the [Fairview] substation ... [and] Detective Robinson searched him". And in his written report on the incident, Webster wrote, "I handcuffed [Riney] and we took [both Riney and Stevenson] to the Fairview [substation]. I interviewed both on tape; Detective Robinson searched Riney and found a small amount of cocaine on his person."

Riney is correct that the evidence is conflicting on this point. But Judge Rowland, in his ruling, acknowledged the conflicting evidence and resolved the conflict against Riney:

THE COURT: There's a question as to whether the search occurred down on Fourth Avenue and C [Street], or whether it occurred down at the substation. I've considered Mr. Riney's testimony, [but his] testimony ... appears to be based more upon his reasoning processes than upon his recollection. I've looked at the wording [of the officer's] statements [to the magistrate at Riney's arraignment], and, of course, [I have] heard about the other statements made by the officers. The language [of those statements] certainly could be ... confusing if you're trying to ... establish[ ] a chronological order of events. On the other hand, it ... should be remembered that, at the time these statements were made, probably the chronology was not deemed to be of particular importance. I don't see it as an attempt to mislead anybody.

I've listened to the officers' testimony and, frank[ly], I believe them. It appears that the search took place on Fourth Avenue[, and it] ... appears to be incidental to a lawful arrest.

We have examined the record, and Riney has not convinced us that Judge Rowland's finding is clearly erroneous. *Wilburn v. State,* 816 P.2d 907, 911 (Alaska App.1991) (when an appellate court reviews a trial court's ruling on a motion to suppress, the trial court's findings of fact govern unless they are clearly erroneous).

Riney argues that the record does not tell the whole story. He contends that if the tape of Stevenson's station-house interview had been preserved, that tape might have contained statements to indicate that the search occurred at the station. This argument was not presented to the trial judge when Riney litigated his suppression motion. It is therefore not preserved.

■ Moreover, we find this argument unpersuasive. First, as explained in more detail below, the trial court found that the tape of the Stevenson interview had been lost through negligence, not through an act of intentional destruction or concealment. Second, no testimony was presented to establish the contents or subject matters of Stevenson's interrogation. The record gives little reason to conclude that the missing tape contained statements that would have pinpointed where the search of Riney took place. As noted above, Riney introduced evidence that, viewed in the light most favorable to him, strongly indicated that the search had occurred at the station house. There is no reason to believe that the missing tape held any stronger evidence than this. Because of this, Riney has not shown a reasonable possibility that he was prejudiced

by the loss of the tape. *See Catlett v. State,* 585 P.2d 553, 557–58 (Alaska 1978) (even though the police lost or destroyed photographs of the crime scene, the defendant was not prejudiced when the record showed that the photographs would be cumulative of other available evidence).

We therefore uphold the superior court's ruling that the cocaine was admissible against Riney.

*Did the police unreasonably delay Riney's first appearance in front of a magistrate?*

In the previous section, we concluded that any delay in bringing Riney before a magistrate did not affect the admissibility of the cocaine found on his person, because that cocaine was found at the time (and at the scene) of his arrest. However, Riney's speedy-initial-appearance claim affects another aspect of this case. Following his arrest, Riney was taken to the police station, where he was interrogated. Riney apparently asked to be brought before a magistrate immediately, but the police officers ignored this request. During the ensuing stationhouse interrogation, Riney made statements that were later used against him. He was not taken before a magistrate until approximately two hours following his arrest.

Riney asserts that this two-hour delay was unnecessary and that, because of this unnecessary delay, his statements at the police station should be suppressed. He bases his argument on both the Fourth Amendment and on Alaska Criminal Rule 5(a).

*Riney's claim under the Fourth Amendment.* In *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the United States Supreme Court held that the Fourth Amendment's protection against unreasonable seizures included the requirement that an arrested suspect receive prompt judicial review of the government's reasons for the arrest. In *Riverside County v. McLaughlin,* 500 U.S. 44, 56, 111 S.Ct. 1661, 1670, 114 L.Ed.2d 49 (1991), the Supreme Court declared that, to satisfy *Gerstein*'s requirement of prompt judicial review, the government must normally secure this probable cause determination within 48 hours of a suspect's arrest. Delays of longer than 48 hours are

presumptively unreasonable, with the government shouldering the burden of proving good reason for the added delay. *See also Powell v. Nevada,* 511 U.S. 79, 80, 114 S.Ct. 1280, 1281, 128 L.Ed.2d 1, 5 (1994).

In Riney's case, judicial review of the reasons for his arrest occurred at his initial appearance, some two hours after his arrest. Compared with the 48 hours granted by *McLaughlin* and *Powell,* a two-hour delay appears inconsequential. However, *McLaughlin* allows for the possibility that delays shorter than 48 hours are nonetheless unreasonable:

> [We do not] say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours. [An arraignment held within 48 hours] may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake.

*McLaughlin,* 500 U.S. at 56, 111 S.Ct. at 1670, 114 L.Ed.2d at 63.

Riney asserts that the two-hour delay in his case was unreasonable. He points out that he was arrested in downtown Anchorage, just blocks from the courthouse, so that the police might easily have taken him directly to an initial appearance rather than taking him to the police station. Riney further asserts that the officers' main motivation for holding him at the police station for two hours was their desire to question him and try to obtain more evidence against him.

This reasoning convinced Judge Rowland. After hearing evidence on this point, the judge concluded:

> I have little doubt that the reason [Riney] was detained at the [police] substation was so that the interview could be conducted. Under federal case law, that would be "unnecessary delay", and I [am aware of no authority] that would contravene the notion that keeping a defendant around to

gather additional evidence to support the arrest or the charge is "necessary" delay. However, despite his finding that the delay was unnecessary, Judge Rowland concluded that exclusion of the evidence was not the proper remedy for this error. The judge therefore denied Riney's motion to suppress the statements he made at the police station.

On appeal, Riney argues that Judge Rowland was correct in finding that the two-hour delay was unreasonable, but that the remedy should be suppression of all evidence obtained while Riney was at the police station. We disagree with both of Riney's contentions.

■ It is important to understand that the hearing required under the Fourth Amendment by Gerstein and McLaughlin is not the same thing as an "arraignment" or an "initial appearance". Under Gerstein, judicial review of a warrantless arrest is designed to accommodate the same Fourth Amendment interests as the judicial review of probable cause that precedes the issuance of an arrest warrant:

> Maximum protection of individual rights could be assured by requiring a magistrate's review of the factual justification prior to any arrest, but such a requirement would constitute an intolerable handicap for legitimate law enforcement. Thus, while this Court has expressed a preference for the use of arrest warrants when feasible, it has never invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant.
>
> Under this practical compromise, a policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest. Once the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate.

Gerstein, 420 U.S. at 113–14, 95 S.Ct. at 862–63, 43 L.Ed.2d at 64–65 (citations omitted).

The judicial review that precedes the issuance of an arrest warrant is non-adversarial—that is, the hearing is conducted ex parte, and the government can rely on affidavits and hearsay. Gerstein, 420 U.S. at 120, 95 S.Ct. at 866, 43 L.Ed.2d at 69. Because the Gerstein hearing is intended to provide the postarrest equivalent of a warrant application in circumstances where an arrest is made without a warrant, the Gerstein Court specifically disapproved the Fifth Circuit's ruling that the probable cause hearing had to be "accompanied by the full panoply of adversarial safeguards—counsel, confrontation, cross-examination, and compulsory process for witnesses". Id., 420 U.S. at 119–120, 95 S.Ct. at 866, 43 L.Ed.2d at 68. The Gerstein Court further declared that the probable cause hearing, "[b]ecause of its limited function and its nonadversary character," is not a "critical stage" in the prosecution.

The Court recognized that many states might find it "desirable" to accomplish this Fourth Amendment "probable cause determination" during the suspect's first appearance before a judicial officer. Id., 420 U.S. at 123, 95 S.Ct. at 868, 43 L.Ed.2d at 71. However, the probable cause determination required by Gerstein is conceptually different from the procedures that generally occur at a suspect's first appearance—reading the charges, apprising suspects of their basic procedural rights, setting bail, and making arrangements for suspects to obtain counsel. The Gerstein decision does not require any of these "first appearance" procedures. By the same token, the speedy accomplishment of these "first appearance" procedures is no substitute for what Gerstein does require— "a fair and reliable determination of probable cause ... by a judicial officer either before or promptly after arrest". 420 U.S. at 125, 95 S.Ct. at 868–69, 43 L.Ed.2d at 71–72.

In sum, Gerstein and McLaughlin are not "speedy initial appearance" or "speedy arraignment" cases; they do not require the police to promptly bring an arrested suspect to the courthouse for advisement of rights, setting of bail, and appointment of counsel. Gerstein and McLaughlin require one thing—prompt judicial determination that there is indeed probable cause to hold the defendant. If that determination occurs before the arrest (that is, if the defendant is arrested pursuant to a warrant), then Ger-

*stein* and *McLaughlin* require nothing more. *See State v. Vice*, 2 Neb.App. 930, 519 N.W.2d 564, 566 (1994). Indeed, because the explicit aim of *Gerstein* is to equalize the treatment of arrestees—by giving suspects who have been arrested without a warrant the same judicial review that occurs during a warrant application—it would be anomalous to interpret *Gerstein* as conferring special procedural rights on suspects arrested without a warrant, rights not shared by suspects who have been arrested on warrants.

What, then, of *McLaughlin*'s declaration that even when a *Gerstein* hearing is held within 48 hours, the timing of the hearing may still be unreasonable if the delay was "for the purpose of gathering additional evidence to justify the arrest"? As just explained, *McLaughlin* is intended to implement *Gerstein*'s requirement that a judicial officer promptly review the justification for the arrest. *Gerstein* and *McLaughlin* obviously do not allow the government to justify an arrest by relying on information acquired after the arrest. At the same time, *Gerstein* and *McLaughlin* do not bar the police from pursuing their investigative efforts, so long as probable cause for the arrest is decided on the basis of the government's evidence at the time of the arrest.

In *United States v. Daniels*, 64 F.3d 311 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 745, 133 L.Ed.2d 693 (1996), the defendant was arrested for bank robbery. Daniels was arraigned within the 48–hour time limit of *McLaughlin* (some 40 hours after his arrest), but he argued that the police delayed his arraignment so that they could gather more evidence against him—specifically, so they could conduct another lineup while Daniels was still in their custody.

The Seventh Circuit concluded that Daniels's argument "misapprehend[ed]" *McLaughlin* because *McLaughlin* only prohibits delays designed to "gather[ ] additional evidence to justify the arrest".

The line-up of March 24th was not conducted to justify Daniels' arrest; it was done to collect more evidence against Daniels. [Officer] Ewer's affidavit stated that [the] probable cause to arrest Daniels was based on the identification[s] of two unnamed witnesses of a photo array containing Daniels' picture and the "positive" identification of another unnamed witness. The result of [the March 24th] line-up did not appear in Ewer's affidavit because it was conducted after [his] affidavit was taken on March 23rd.

*Daniels*, 64 F.3d at 314. The court continued:

Daniels' argument seems to interpret *Riverside [v. McLaughlin]* to preclude law enforcement from bolstering its case against a defendant while he awaits his *Gerstein* hearing; that is a ludicrous position. *Gerstein* and its progeny simply prohibit law enforcement from detaining a defendant to gather evidence to justify his arrest, which is a wholly different matter. Probable cause to arrest Daniels already existed[.]

*Id.*

The North Carolina Supreme Court reached a similar conclusion in *State v. Chapman*, 343 N.C. 495, 471 S.E.2d 354, 356 (1996). The court held that interrogating a defendant about the crimes for which he was just arrested is not an "unnecessary delay", either for purposes of *McLaughlin* or for purposes of North Carolina Statute § 15A–501(2), which requires the police to take an arrestee before a magistrate "without unnecessary delay". *Accord Peterson v. State*, 653 N.E.2d 1022, 1025 (Ind.App.1995) (police officers' decision to interrogate an arrested suspect does not constitute an unreasonable delay as long as the police already have probable cause for the arrest).

■ We agree with these cases. If *McLaughlin* were interpreted in the manner Riney suggests, it would lead to an unjustifiable disparity in treatment between persons arrested on warrants and persons arrested without warrants. Under even the most expansive interpretation of *McLaughlin*, persons arrested on warrants can be interrogated following their arrest: no *Gerstein* hearing is required when a person is arrested on a warrant, because the judicial determination of probable cause for the arrest has already been made. *See State v.*

*Vice,* 519 N.W.2d at 566. Thus, under Riney's reading of *McLaughlin,* the existence or non-existence of an arrest warrant would determine whether the police were authorized to question someone they had just taken into custody. Riney suggests no rationale for such a rule, and we perceive no convincing rationale for it either. So long as the police do not detain a suspect for the purpose of gathering probable cause to justify the arrest after the fact, questioning an arrestee about the crime(s) for which he or she has been arrested does not constitute an "unreasonable" delay under *Gerstein* and *McLaughlin.*

■ For these reasons, we conclude that the police did not violate Riney's rights under the Fourth Amendment (as interpreted in *Gerstein* and *McLaughlin* ) when they detained him at the police station for two hours before taking him to the courthouse for his initial appearance before a magistrate.

*Riney's claim under Alaska Criminal Rule 5(a)(1).* Riney also argues that the police violated state law when they took him to the police station before taking him to the courthouse for his first appearance in front of a magistrate. Riney relies on Alaska Criminal Rule 5(a)(1):

> Except [for persons who are issued a citation and immediately released], [an] arrested person shall be taken before the nearest available judge or magistrate without unnecessary delay.... Unnecessary delay ... is defined as a period not to exceed twenty-four hours after arrest[.]

*See also* AS 12.25.150(a) ("A person arrested shall be taken before a judge or magistrate without unnecessary delay, and in any event within 24 hours of arrest[.]").

Although Criminal Rule 5(d) calls upon the judge or magistrate to conduct a *Gerstein* inquiry at the same time as an arrestee's initial appearance (if the person was arrested without a warrant), it is clear that the initial appearance required by Rule 5(a) is a much broader procedural protection than the probable cause determination required by *Gerstein.* The purposes of the initial appearance are to inform the arrestee of the charge(s), to

inform the arrestee of the basic procedural rights of criminal defendants, to allow the arrestee to request counsel, and to require the judge or magistrate to establish bail. *See* Criminal Rule 5(c). Rule 5(a)(3) expressly states that an arrestee is entitled to this initial hearing regardless of whether the arrest was made pursuant to a warrant or was made without a warrant.

Criminal Rule 5(a)(1) states that a defendant's initial appearance must be held "without unnecessary delay". Riney asserts that the police engage in "unnecessary delay" whenever a judicial officer is available to conduct an arrestee's initial appearance but the police nevertheless interrogate the arrestee (or engage in other investigative activities, such as conducting a lineup) before taking the arrestee to the initial appearance mandated by Rule 5(a)(1).

The impetus for Alaska Criminal Rule 5(a)(1) and its siblings in other jurisdictions came from the United States Supreme Court's decisions in *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). Under the *McNabb /Mallory* rule, the police must

> arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined. The arrested person may, of course, be "booked" by the police. But he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself ... to eliciting damaging statements to support the arrest and ultimately his guilt.
>
> ... Circumstances may justify a brief delay between arrest and arraignment, as[,] for instance, where the story volunteered by the accused is susceptible of quick verification through third parties. But the delay must not be of a nature to give opportunity for the extraction of a confession.

*Mallory,* 354 U.S. at 454–55, 77 S.Ct. at 1359–1360, 1 L.Ed.2d at 1483.[1]

---

1. The Supreme Court promulgated the *McNabb* /*Mallory* rule under its supervisory authority over

Riney relies on this passage from *Mallory*, particularly the Court's statement that the delay in arraigning a suspect "must not be of a nature to give opportunity for the extraction of a confession". However, this reference to "extract[ing] a confession" appears to have been aimed at delays so lengthy as to induce involuntary confessions. As discussed below, courts construing this language have held that it does not bar routine post-arrest questioning of a suspect.

*McNabb* and *Mallory* must be understood in context. These two cases established a supervisory rule to protect arrestees. However, starting in the 1960's, the Supreme Court erected constitutional safeguards that provided more direct, more effective methods for preventing the evil that the *McNabb /Mallory* rule was designed to prevent (that is, stopping the police from extracting confessions from unadvised arrestees who are being held incommunicado). The federal Constitution now requires that any custodial interrogation be preceded by the warnings and procedural protections announced in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny. In addition, the government can not use statements that are the fruit of an illegal arrest. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In Alaska, moreover, a defendant has the right to an immediate telephone call, *Zsupnik v. State*, 789 P.2d 357 (Alaska 1990), and custodial interrogations must normally be tape recorded. *Stephan v. State*, 711 P.2d 1156 (Alaska 1985).

It appears that the creation of these procedural protections has led to a scarcity of judicial decisions on the point Riney raises in this appeal. Most states have enacted statutes or rules requiring that an arrestee's initial appearance occur "without unneces-

sary delay", so that "prompt appearance is a common if not universal requirement under state law". *See* Wayne R. LaFave and Jerold H. Israel, *Criminal Procedure* (1984), § 6.3(c), Vol. 1, p. 457. However, there are surprisingly few judicial decisions that directly decide whether these statutes and rules bar the police from conducting post-arrest interrogation before they take an arrestee in front of a judicial officer.

The sparseness of the case law appears to be due to the fact that most state courts have rejected the notion that unnecessary delay in bringing an arrestee before a judicial officer automatically requires suppression of the arrestee's statements. *Sovalik v. State*, 612 P.2d 1003, 1007 n. 7 (Alaska 1980); *LaFave & Israel*, § 6.3(c), Vol. 1, p. 457. Instead, most states have concluded that any unnecessary delay in holding the arrestee's initial appearance is simply one factor to be considered in deciding whether the arrestee's statements were voluntary. *Clay v. State*, 318 Ark. 122, 883 S.W.2d 822, 827–29 (1994); *Thorson v. State*, 653 So.2d 876, 887 (Miss. 1994); *Veal v. State*, 585 So.2d 693, 699 (Miss.1991); *State v. Tucker*, 137 N.J. 259, 645 A.2d 111, 117–19 (1994), *cert. denied*, 513 U.S. 1090, 115 S.Ct. 751, 130 L.Ed.2d 651 (1995); *State v. Huddleston*, 924 S.W.2d 666, 670–71 (Tenn.1996); *Cantu v. State*, 842 S.W.2d 667, 679 (Tex.Crim.App.1992), *cert. denied*, 509 U.S. 926, 113 S.Ct. 3046, 125 L.Ed.2d 731, *reh'g denied*, 509 U.S. 941, 114 S.Ct. 16, 125 L.Ed.2d 768 (1993). *See also Commonwealth v. Abdul–Salaam*, 544 Pa. 514, 678 A.2d 342, 348 n. 11 (1996) (any unreasonable delay in bringing the defendant to court for his initial appearance would not require suppression of an eye-witness identi-

the federal courts, not as a rule of constitutional law. Thus, the rule never was binding on the states. But because *McNabb /Mallory* was apparently the impetus for Alaska's Criminal Rule 5(a)(1), this language from *Mallory* should be taken into account when interpreting Rule 5(a)(1).

It should be noted that the *McNabb /Mallory* rule no longer exists in federal jurisprudence. Congress abolished the rule when it passed the Omnibus Crime Control and Safe Streets Act of

1968. Under current federal law, all statements given by an arrestee within six hours of arrest "shall not be inadmissible solely because of [the] delay" in bringing the person before a judicial officer, 18 U.S.C. § 3501(c). And even when the arrestee's initial appearance is delayed longer than six hours, that delay is merely one factor to be considered in determining whether the arrestee's confession was voluntary, 18 U.S.C. § 3501(b). *See*, for example, *West v. Johnson*, 92 F.3d 1385, 1404–05 (5th Cir.1996).

fication that occurred more than 48 hours after his arrest).[2]

Examination of the cases cited in the previous paragraph reveals that it is generally difficult for defendants to show that their post-arrest statements were tainted by the lack of a prompt initial appearance. Under *Miranda*, before any custodial interrogation takes place, arrestees must be informed that they need not say anything to the police, that they can stop answering questions at any time, and that they have a right to delay questioning until they have secured the assistance of a lawyer (at public expense if need be). If the police have complied with *Miranda*, a defendant generally will be unable to argue convincingly that receiving a similar advisement of rights at an arraignment or an initial appearance would have altered his decision to speak to the police. For analogous reasons, courts have not been receptive to the argument that a defendant might have gained bail release and thus would not have been in custody to listen to the officers' questions. *See Cannon v. State*, 904 P.2d 89, 95 (Okla.Crim.App.1995), *cert. denied,* ── U.S. ──, 116 S.Ct. 1272, 134 L.Ed.2d 219 (1996) ("Cannon claims that he was prejudiced by ... the delay in seeing a magistrate because, if bail had been set ..., he could have made bail and been out of jail before the time he made the statements about [the victim's] murder[.] This is speculative at best.").

Because there is no rule of automatic suppression, and because defendants generally have difficulty showing that the delay in holding their initial appearance tainted their statements to the police, courts generally devote little effort to deciding whether the police's desire to interrogate the defendant constituted "unnecessary delay" under the facts of the defendant's case. Instead, these courts move directly to the question of whether the defendant's statements were voluntary or were, instead, a tainted product of the delay.

Nevertheless, there are some decisions that directly address the question of whether post-arrest interrogation is "unnecessary delay" for purposes of a "prompt appearance" rule. The answer reached by these courts is that interrogation incidental to an arrest is not "unnecessary delay" (assuming the police had probable cause for the arrest). *United States v. Daniels*, 64 F.3d 311, 313–14 (7th Cir.1995); *People v. Turner*, 8 Cal.4th 137, 32 Cal.Rptr.2d 762, 782–83, 878 P.2d 521, 541–42 (1994), *cert. denied,* ── U.S. ──, 115 S.Ct. 1702, 131 L.Ed.2d 564 (1995); *Peterson v. State*, 653 N.E.2d 1022, 1025 (Ind.App.1995); *State v. Chapman*, 343 N.C. 495, 471 S.E.2d 354, 356 (1996); *State v. Littlejohn*, 340 N.C. 750, 459 S.E.2d 629, 633–34 (1995). *But see Black v. State, supra* n. 2.

We find ourselves in agreement with the cases cited in the last paragraph; that is, we conclude that reasonable post-arrest interrogation of an arrestee does not constitute "unnecessary delay" for purposes of Alaska Criminal Rule 5(a)(1). As was pointed out in *Goldsmith v. United States*, 277 F.2d 335 (D.C.Cir.1960), the existence of probable cause for arrest does not necessarily provide the answer to whether an arrestee should be charged or released. Despite probable cause for arrest, the facts may ultimately demonstrate the arrestee's innocence. Moreover, probable cause does not equal a provable case. To make an informed charging decision, the government may still need to clarify the facts of the offense and the arrestee's role in it. *Id.* at 342–43.

Moreover, it should be remembered "that interrogation is not an evil *per se*", *Goldsmith*, 277 F.2d at 344, but rather a valid investigative technique. *Miranda*, 384 U.S. at 478, 481, 86 S.Ct. at 1630, 1631. Under Riney's suggested interpretation of Rule

**2.** Indeed, any other result would be surprising. Even when a person is arrested illegally, the government is still able to use the person's statements to the police if the government proves that those statements were not tainted by the illegal arrest. *Dunaway v. New York*, 442 U.S. at 216–19, 99 S.Ct. at 2258–60, 60 L.Ed.2d at 838–40 (1979). It seemingly makes no sense to allow the government to establish harmless error when a

defendant is arrested illegally, but at the same time impose a rule of automatic suppression when a legally arrested defendant is brought late to his or her initial appearance. *But see Black v. State*, 871 P.2d 35, 39 (Okla.Crim.App.1994) (holding that any statement given after an unjustified delay of 48 hours or more is presumptively inadmissible).

5(a)(1), the propriety of post-arrest interrogation would depend, not on the facts of the case or the desirability of interrogation, but rather on whether the Alaska Court System had decided to fund 24–hour magistrate services in that locality. There appears to be little rationale for such a result. Nor does it seem likely that the Alaska Supreme Court, acting in its role as administrator of the judicial branch of government, intended its magistrate funding decisions to affect the legality of traditional police investigative practices.

In sum, we hold that routine interrogation of a lawfully arrested suspect is not "unnecessary delay" for purposes of Alaska Criminal Rule 5(a)(1).

*Should the trial court have suppressed the incriminatory statements Riney made at his arraignment, when the State failed to disclose these statements before trial?*

During Riney's arraignment, the prosecutor described how cocaine was found in Riney's pocket. Hearing the prosecutor's description, Riney spoke up and told the magistrate, "Well, it was just five dollars' worth, and I forgot that I had it in my pocket. It wasn't to sell. I just forgot that it was in my pocket." The prosecutor made a note of Riney's words in her file. However, the existence of Riney's prior statements was not revealed to his defense attorney until, during trial, the prosecutor announced that she intended to call the in-court clerk who had been on duty during Riney's arraignment.

When the defense attorney discovered what had happened, he asserted that the

prosecutor had violated Criminal Rule 16(b)(1) and he asked the trial judge to suppress Riney's statements. Superior Court Judge Milton M. Souter agreed that the prosecutor had violated Criminal Rule 16(b), but the judge ruled that suppression of the late-disclosed evidence was not the appropriate remedy.

■ In our opinion, it is a close question whether the prosecutor's action violated Criminal Rule 16(b)(1).[3] However, we need not resolve this question. Even assuming that Rule 16 was violated, Judge Souter correctly held that Riney was not entitled to suppression of his statements. Under *Bostic v. State,* 805 P.2d 344, 347–48 (Alaska 1991), the appropriate remedy was at most a mistrial. However, Riney never sought a mistrial; he asked only for suppression of the evidence.

The record suggests that Riney's failure to ask for a mistrial may have been tactical. As noted above, Riney's defense was that the police had planted the cocaine on him. Riney's volunteered statements at his arraignment clearly undermined this defense. However, because Riney was charged with a possessory offense, Riney and his attorney might reasonably have concluded that obtaining a mistrial would only delay the inevitable—and that therefore their request for relief should be "all or nothing".

■ Moreover, as we have noted in the past, trial judges must be extremely cautious about granting a mistrial when the defendant has not sought one. Under the double jeopardy clause, if a judge declares a mistrial *sua sponte* when there is no necessity for it, the

---

3. Under Criminal Rule 16(b)(1)(A)(ii), the State must make pretrial disclosure of all "summaries of statements and the substance of any oral statements made by the accused". Rule 16(b)(1) is based upon ABA Standard 11–2.1, "Discovery and Procedures Before Trial". This Standard was intended to cover any statement made by the defendant "to prosecution or police personnel", as well as a defendant's statements "to a third party". *See* Commentary, Standard 11–2.1(a)(ii) (American Bar Association Standards for Criminal Justice, (2nd ed. 1980)). The issue raised in Riney's case is whether a defendant's statements to a third party include statements the defendant makes on the record to a judicial officer in open court.

If the answer is "yes", then the State would seemingly be obliged to furnish written accounts of most if not all of the defendant's pre-trial appearances. Rule 16(b)(1) does not limit the State's disclosure obligation to statements that the government intends to rely upon; rather, the obligation applies to all of a defendant's statements. Because defendants often testify at suppression hearings, and because defendants generally make at least some statements at bail hearings, scheduling conferences, omnibus hearings, and the like, a broad interpretation of Rule 16(b)(1) would require the State to furnish a summary or transcript of the defendant's utterances at all of these hearings. To our knowledge, this is not currently the practice in Alaska.

charges against the defendant must be dismissed. *Nelson v. State,* 874 P.2d 298, 308 (Alaska App.1994); *March v. State,* 859 P.2d 714, 717 (Alaska App.1993). For this reason, we do not find that Judge Souter committed plain error when he failed to declare a mistrial on his own motion.

In sum, we agree with Judge Souter that Riney was not entitled to suppression of the statements he made at his arraignment.

*Did the prosecutor misstate the law during her summation to the jury?*

■ Riney contends that, during final argument, the prosecutor misstated the law regarding reasonable doubt by suggesting that reasonable doubt could not be predicated on suspicion or conjecture. During the rebuttal portion of her final argument, responding to the defense attorney's contention that the police had planted the cocaine on Riney, the prosecutor said to the jurors:

When I gave my [first] argument, I asked you to convict Mr. Riney based on the facts and not on suspicion [or] conjecture, not on speculation [or] guess-work [or] imaginings. But [defense counsel] is asking you to acquit the defendant just on that: [on] suspicion, conjecture, guessing, imagining. [That's] the only proof that he has of planting evidence[.] ... [Defense counsel] is asking you to find—based on the questions he asked, not on the responses he got—that all four police officers ... are corrupt, are dishonest, ... that they lied, that they plant[ed] evidence, that they [came] to court and commit[ted] perjury, and that somehow they managed to conspire to ... frame an innocent man that some of them did not know before, and that none of them had a personal grudge against for any reason. And [defense counsel] is asking you to believe that [the officers] did that without leaving any evidence at all of a conspiracy, of perjury or fraud. He's asking you to imagine that this happened.

We do not construe the prosecutor's remarks as a comment on the meaning of "reasonable doubt". Rather, these comments are addressed to a factual theory offered by the defense: the theory that the

cocaine was "found" on Riney's person because the police put it there. The prosecutor engaged in fair comment on the defense theory when she argued that there was no evidence to support it. Her remarks, taken in context, do not suggest that a defendant must present affirmative evidence of his innocence, nor do they suggest that a defendant is barred from relying on doubts left by shortcomings in the government's evidence. In short, we find no error.

*Was Riney entitled to an instruction telling the jury to presume that the lost audiotape of his co-defendant Stevenson's police interview would have contained evidence favorable to Riney?*

As described above, both Riney and his co-defendant Stevenson were taken to the police station following their arrest, where they were each interviewed. These interviews were taped. In preparation for Riney's trial, the State furnished Riney with a tape of his interview, but the police were unable to find the tape of Stevenson's interview. On appeal, Riney argues that this missing tape might have contained evidence favorable to him, and that therefore the jury should have been instructed to presume that the missing tape was favorable to Riney. *See Thorne v. Department of Public Safety,* 774 P.2d 1326, 1331–32 (Alaska 1989).

Riney suggests that the police might have intentionally destroyed the tape. After hearing evidence surrounding the loss of the tape, Judge Souter explicitly rejected this suggestion:

THE COURT: [The tape] was lost; they don't know what happened to it. They looked for it, couldn't find it. They looked for it again[.] ... They kept looking for it; they couldn't find it. The DA's own file shows [that] they were after it[.] There does not appear to be any evidence whatsoever from which a reasonable inference could be drawn that someone deliberately went out and destroyed Mr. Stevenson's taped statement.

The record supports Judge Souter's finding.

Riney next argues that, even if the tape was lost in good faith—mislaid or otherwise

lost through neglect—he was still entitled to have the jury told that they should presume the missing tape was favorable to him. Under *Thorne* and *Putnam v. State,* 629 P.2d 35 (Alaska 1980), we must resolve Riney's claim by examining (1) whether the State acted in good or bad faith, (2) the degree of the State's culpability (including negligence), (3) the importance of the lost evidence, and (4) the likelihood that Riney suffered prejudice on account of the loss of this evidence. *Thorne,* 774 P.2d at 1331; *Putnam,* 629 P.2d at 43–44.

Judge Souter's findings (quoted above) suggest that the State acted in good faith and that the State's level of culpability was low. Further, the lost evidence appears to have been cumulative of other evidence already available to Riney—his own tape-recorded interview with the police.

Riney argues that the tape of Stevenson's interview might have contained evidence that the cocaine was found at the police station, not on Fourth Avenue. He points out that the tape of his (Riney's) own interview contains certain statements made by Officer Webster that, if viewed in a light favorable to Riney, tend to show that the cocaine was found during a station-house search, not during Riney's initial arrest on Fourth Avenue.[4] Riney argues that if Webster made statements like that during the interrogation of Riney, then Webster might have made similar statements during the interrogation of Stevenson.

We find Riney's suggestion speculative at best. Riney never sought to interrogate Webster or Stevenson regarding the content of the interview, nor did Riney present any other evidence suggesting that the missing tape contained statements about when or where the cocaine was found. Even assuming that this subject came up during Stevenson's interview, the record contains no indication that Webster's remarks to Stevenson were any more favorable to Riney than the statements Webster made during his interrogation of Riney—statements that were preserved, that were furnished to Riney, and that Riney relied on in the superior court.

■ When we analyze the facts of Riney's case in light of the factors laid down in *Thorne* and *Putnam,* we conclude that Judge Souter did not abuse his discretion when he refused Riney's request to instruct the jury that the missing tape of the Stevenson interview should be presumed to contain additional evidence favorable to Riney.[5]

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

**4.** As described above, Riney relied on these statements at the suppression hearing, but Judge Rowland did not interpret them in the light most favorable to Riney; instead, the judge concluded that Webster's statements were consistent with the State's assertion that the cocaine was found during the initial arrest.

**5.** We additionally note that Riney's primary argument on appeal is that the Stevenson tape would have helped him litigate his suppression motion (by identifying the police station as the site of the discovery of the cocaine). Suppression motions are decided by the court, not the jury. Thus, even if Riney had shown that the missing tape was relevant for this purpose, he still would not have been entitled to a jury instruction.