[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 11, 2008
THOMAS K. KAHN
CLERK

_____

No. 04-11711
_____

D.C. Docket No. 01-00029-CV-C-E


JAMES CHARLES LAWHORN,

Petitioner-Appellee,

versus

RICHARD F. ALLEN, Commissioner,
Alabama Dept. of Corrections,
ATTORNEY GENERAL OF ALABAMA,

Respondents-Appellants.


_____

Appeal from the United States District Court for the
Northern District of Alabama
_____

**(March 11, 2008)**


Before: BIRCH, BARKETT and WILSON, Circuit Judges.

BIRCH, Circuit Judge:

An Alabama jury found petitioner James Charles Lawhorn ("Lawhorn") guilty of capital murder and recommended that he be sentenced to death. The state circuit court judge adopted that recommendation and sentenced Lawhorn to death. After exhausting his state court remedies, Lawhorn filed a federal habeas corpus petition pursuant to 28 U.S.C. § 2254. The district court granted in part and denied in part Lawhorn's habeas petition, and the state appealed.[1] After a thorough review of the record, and having the benefit of oral argument and the parties' briefs, we REVERSE the district court's judgment granting Lawhorn habeas relief by suppressing his confession, and AFFIRM the district court's judgment granting Lawhorn habeas relief on the issue of ineffective assistance of counsel.

## I. BACKGROUND[2]

During the late morning of 31 March 1988, Sylacauga, Alabama Police Officer Kenneth Brasher observed some people arguing across the street from the gas station where he had stopped. He saw a woman in a truck that belonged to

---

[1] A certificate of appealability is not required in an appeal by a state. Fed. R. App. P. 22(b)(3).

[2] Except as otherwise cited, the facts are taken from opinions of the Alabama Court of Criminal Appeals. See Ex parte Lawhorn, 581 So.2d 1179, 1180 (Ala. 1991) ("Lawhorn II") (referencing the "detailed statement of the pertinent facts" found at Lawhorn v. State, 581 So. 2d 1159 ( (Ala. Crim. App. 1990) ("Lawhorn I")) and Lawhorn v. State, 756 So. 2d 971 (Ala. Crim. App. 1999) (Lawhorn V) (referencing the "essential facts of this case" recited in Lawhorn I).

Altion Maxine Walker, and also saw William Clarence Berry run and get into his automobile while being chased by James Charles Lawhorn, Walker's nephew. Lawhorn I, 581 So. 2d 1159, 1161 (Ala. Crim. App. 1990); R1-17, Tab 9 at 287-294.

About 3:30-4:00 P.M. that same day, Grover C. Williams saw a truck turn toward him off Highway 148 and onto a dirt road. Id. at 294-96. Williams said that there were three "fairly young people" sitting in the front seat of the truck cab and "at least one of them" had a "heavy beard." Id. at 295-96.

Mona Lisa Jones, who lived across a road from Collier's Store, on Highway 148 east of Sylacauga near Wiregrass Road, said that she and her husband followed a red car and a truck on the road out from Sylacauga toward their house. Id. at 282. The car was driven by a man; the truck was driven by a woman. After both drivers got out of their vehicles to buy drinks from a machine in front of the store, they got into the truck and drove away. Id. at 283-84. Around 3:30-4:00 P.M., William Collier, the owner of Collier's Store, returned from a trip to Sylacauga to find a car sitting in front of his closed store. Id. at 279-80. The car remained in front of Collier's Store until it was towed by police officers on 2 April.

3

On 2 April, Berry's body was found in a wooded area off Wiregrass Road near Sylacauga, Alabama. An autopsy revealed forehead abrasions and 27 gunshot wounds from a pistol or a rifle and a shotgun. Lawhorn v. State, 575 So. 2d 1159, 1161 (Ala. Crim. App. 1990) ("Lawhorn I"). "The cause of death was 'multiple gunshot and shotgun wounds'" because "[t]he wounds from either weapon would have been fatal."[3] Id. That evening and in the following days, a shotgun, pistol, and shells were recovered from Walker's residence. A firearms expert noted that the spent shotgun shells found near the victim's body had the "same class characteristics" as the shotgun recovered from Walker's residence, but was unable to say with absolute certainty whether the spent shells were fired from the shotgun. Id. He was, however, able to determine that the spent .25 auto-caliber projectiles recovered from the victim's body were fired from the pistol. A fingerprint expert matched a print lifted from the exterior passenger door of Walker's truck to Lawhorn.

---

[3] There were four entrance wounds from the pistol or rifle: one to the neck, one to the chin, and two to the chest. Lawhorn I, 581 So. 2d at 1161. The wound to the chin, which traveled to the brain, and the one of the wounds to the chest, which severed the spine and spinal cord, "caus[ed] death instantly." Id. The remaining twelve entrance wounds were from the shotgun and were to both arms, the upper abdomen, the chest, the right leg, and upper back. Id.

That evening, Lawhorn was interviewed by Frankie Wallis, an investigator with the Talladega County Sheriff's Department.[4] R1-17, Exh. Tab 9 at 332. Wallis advised Lawhorn of his constitutional rights using a standard Miranda form.[5] Id. at 332-33; Tab 10a at 335-337, 387-88, 392. After he was advised of his rights, Lawhorn indicated that he understood his rights, and answered "[y]es" when asked whether he wished to talk to Wallis and the other officers at that time. Id., Tab 9 at 336; Tab 10a at 388. He then executed a waiver form, witnessed by Wallis, and made a statement. Id., Tab 9 at 336-37; Tab 10a at 388. In the statement, Lawhorn said that he had stayed with Walker for several nights and that he had met Berry, who he understood was Walker's boyfriend. Id. at Tab 9 at 337-38. After he was asked about being seen by Brasher during the morning of 31 March, Lawhorn said that he wanted a lawyer and all questioning stopped. Id. at 338. Lawhorn was then arrested for Berry's murder and placed in the Talladega County Jail.[6] Id., Tab 4 at 6. Lawhorn, however, did not talk to a lawyer at that time or before he next saw Wallis on 7 April.

---

[4] According to Wallis, he spoke to Lawhorn sometime between 9:00 P.M. and midnight. R1-17, Exh. Tab 9 at 333, 335; Tab 10a at 387.

[5] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

[6] The arrest form shows that Lawhorn was arrested on 2 April 1988 at 10:30. The time of day, however, is unclear: the form has two boxes to be checked to indicate whether the time is A.M. or P.M.; the check mark on the form is located in between the two boxes. R1-17, Exh. Tab 4 at 6.

On 7 April, Wallis and Ann Wallace, an employee of the Talladega District Attorney's office, were walking past Lawhorn's cell when Lawhorn called to Wallis and told him that he wanted to talk. Id., Tab 9 at 340-41; Tab 10a at 371-70. Wallis explained to Lawhorn that he could not talk to Lawhorn because he had asked for an attorney but Lawhorn said that he wanted to waive his rights, talk to Wallis, and tell him what had happened. Id., Tab 9 at 341. Wallis told Lawhorn that he was busy but that he would get back with Lawhorn, and Lawhorn responded by telling Wallis to come back. Id. at 341-42.

That afternoon, Wallis, Wallace, and Lieutenant Billy Joe Pope met with Lawhorn. Id. at 343, 348; Tab 10a at 389, 394-95. Wallis again advised Lawhorn of his Miranda rights and Lawhorn stated that he understood his rights and wished to waive them. Id., Tab 9 at 342-45, 348; Tab 10a at 350-51, 389-91. Lawhorn signed a waiver and wrote on it that he did not want a lawyer. Id., Tab 9 at 345-46; Tab 10a at 352, 391. Lawhorn's waiver was then signed by Pope, Wallace, and Wallis as witnesses. Id., Tab 9 at 345-46; Tab 10a at 391. Lawhorn then made two statements. The first statement was made about 3:55 P.M. At that time, Lawhorn stated that Walker tried to hire him to kill Berry but that he would not do it. Id., Tab 9 at 347-48; Tab 10a at 352, 392, 394. After a break in conversation and after Lawhorn was encouraged to tell the truth, Lawhorn made the second

statement about 5:40 P.M.  Id., Tab 9 at 348; Tab 10a at 352-54, 392-93.  Between the two statements that afternoon, the officers did not readminister a Miranda warning, but "referred back" to the Miranda warning given to Lawhorn earlier that same day.  Id., Tab 9 at 348-49.

In the second statement, Lawhorn described in detail his participation in Berry's murder.  He said that, during the week when he was staying with Walker, Walker told him that she was scared of Berry and, almost daily, had offered to pay Lawhorn to "get rid" of Berry.  Lawhorn I, 581 So.2d at 1162.  He said that, while they were out running errands, they picked up Lawhorn's brother, Mac Lawhorn ("Mac"), and Walker asked Mac if he was interested in earning some money. After Mac answered "[y]es" and asked what the job involved, Walker explained that she wanted to "[g]et rid of [Berry]."  R1-17, Exh. Tab 10a at 410.  Walker had Mac lie down in the truck while they drove to retrieve a shotgun and shells from the automobile of Walker's son, Robert Kilgore.  Id. at 410-12.  Walker then drove Lawhorn and Mac to a wooded area which she and Berry had visited.  Lawhorn and Mac got out of the truck and waited in the woods while Walker went to get Berry.  Lawhorn carried a pistol taken from Walker's truck; Mac loaded and then carried the shotgun.

7

Walker returned with Berry, and then she left the truck to go across the road. Berry initially started across the road with Walker and then began running down the road. Walker found Lawhorn and Mac and told them that Berry had run away. She then got into the driver's seat of her truck and had Lawhorn and Mac lie down in the truck bed. She told Lawhorn and Mac that, when she caught up with Berry, she would slam on the brakes.

When she slammed on the brakes, Mac "raised up" in the truck and shot Berry. Lawhorn I, 581 So. 2d at 1162. Berry fell but got up and ran towards the woods. Lawhorn stated that Mac then shot at Berry again. After Berry fell, Lawhorn walked over to Berry and heard him making "gurgling noises." Id. at 1163. Lawhorn said that he shot Berry about three times to "make sure he was dead." Id. Lawhorn and Mac then got back into the truck, Walker put the pistol and the shells into a sack, and they returned to town.

About 5:30 P.M., Lawhorn and Kilgore went to the murder scene to look for any pistol or shotgun shells because Lawhorn did not want to leave any evidence at the scene. They did not find any and went to Walker's house. Kilgore instructed Walker to clean the shotgun and get the pistol but found out that Walker had given pistol to Mac to discard. Lawhorn called Mac, and then went with Walker to Lawhorn's mother's house to retrieve the pistol. Walker waited in the

truck while Lawhorn got the pistol. When they returned to Walker's house, Kilgore took the pistol and said that he would take care of it. The next morning, Lawhorn went to the bank with Walker. She paid Lawhorn $50 "for 'getting rid' of Berry." Id. at 1164.

A complaint charging Lawhorn with intentionally causing the death of Berry pursuant to a contract with Walker for consideration of $100, in violation of Ala. Code 13A-5-40(a)(7), and an arrest warrant were issued on 8 April 1988. R1-17, Exh. Tab 4 at 5, 9.[7] Lawhorn submitted an affidavit of indigency, and on 10 May 1988, attorney Steven D. Giddens was appointed to represent him.[8] R1-17, Exh. Tab 4 at 7-8. Lawhorn was indicted for Berry's murder on 2 June 1988. Id. at 9-10.

---

[7] Walker and Mac were also indicted for murder of Berry pursuant to a contract for hire for $40 consideration. Walker was convicted in 1988 and sentenced to death. On appeal, her conviction was reversed because of a violation under Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986). Walker v. State, 586 So. 2d 49 (Ala. Crim. App. 1991) (remanding for evidentiary proceedings), 611 So.2d 1133 (Ala. Crim. App. 1992), cert. denied (Ala. Jan 22, 1993) (No. 1920188), overruled on other grounds, Smith v. State, 838 So.3d 413 (Ala. Crim. App. 2002) (per curiam). She was retried and convicted in 2004, and sentenced to life. Her conviction was affirmed. Walker v. Alabama, 919 So. 2d 1235 (Ala. Crim. App. 2004). Her petitions for writ of certiorari were denied, In re Walker, 920 So. 2d 1141 (Ala. 2004); Walker v. Alabama, 544 U.S. 925, 125 S. Ct. 1645 (2005).

Mac was convicted in 1989, and sentenced to life without the possibility of parole. Lawhorn v. State, 574 So.2d 970 (Ala. Crim. App. 1990), cert. denied, (Ala. Jan. 25, 1991) (No. 1900484).

[8] Giddens had been in practice less than five years. R1-17, Exh. Tab 43 at 19. His brother, Rod Giddens, was an assistant district attorney assigned to assist in Lawhorn's prosecution. Id. at 23, 97-98. No objection was raised as to any potential conflict resulting from the Giddens brothers serving as defense and prosecuting attorneys. Id. at 71, 98-99.

On 9 June 1988, attorney Hank Fannin was appointed to represent Lawhorn as lead counsel, and Fannin and Giddens appeared with Lawhorn at arraignment. Id., Tab 43 at 7-8, 10, 19, 88. Fannin and Giddens met with Lawhorn on 9 June, 11 August, and on 10 November 1988. Id. at 20-22, 27-28, 33, 94. In June 1988, Giddens prepared and filed a motion to suppress Lawhorn's confession. Id. at 23. In the motion, Lawhorn alleged that his statements "were made under duress in response to a promise of leniency or better treatment." Id. The motion was apparently denied, and the case proceeded to discovery.

During "open court" in January 1989, Lawhorn's attorneys moved for the appointment of an investigator "to discover any mitigating factors . . . of any significance . . . in the event [Lawhorn wa]s convicted." Id., Tab 4 at 22. Investigator Jack Matson was appointed to investigate Lawhorn's background, including his family, education, employment, criminal history, and drug and alcohol use. Id.; Tab 43 at 65-66. In February, Fannin and Giddens moved for "[f]unds to [e]mploy [p]sychiatrist" to "consult with . . . counsel and make . . . investigations and examinations" for preparation of a defense during the guilt

phase and for use as a mitigating factor during the penalty phase. Id., Tab 4 at 18.

This motion was apparently denied.[9]

Although no psychiatric assessment was prepared, a mental assessment was prepared by Talladega Mental Health Center coordinator Gary L. Garner at the request of the trial judge. In the assessment, Garner reported that Lawhorn "admitted to alcohol use since age 14." Id. at 21. Garner opined that Lawhorn appeared "capable of understanding the nature of legal proceedings" that he was facing, "capable of assisting his attorney in preparing for his defense and trial," and not "in need of further psychiatric examination and treatment." Id.

In April 1989, Giddens moved to withdraw as counsel and gave his case file to Fannin. Id., Tab 43 at 41, 88-89. One week before the trial began, attorney Mark Nelson was appointed to represent Lawhorn, with Fannin remaining as lead counsel. Id. at 41-42, 106-07. Fannin and Nelson discussed defense strategies, including suppression of the confession and mitigating factors for the penalty phase in the event Lawhorn was found guilty. Id. at 109-11. Before the trial began, Nelson prepared a motion for change of venue, met once with Lawhorn, reviewed the file, did some library research, and contacted the potential witnesses.

---

[9] There is neither an order addressing the motion for funds to an employ a psychiatrist nor a psychiatric assessment in the record. R1-17, Exh. Tab 43 at 81-85, 102-03.

Id. at 107-14.  The change of venue motion was based on prejudicial pretrial publicity; it was denied on 24 April 1989.  Id., Tab 4 at 13-17.

Lawhorn's trial began on 24 April 1989.  R1-17, Exh. Tab 3.  During the trial, Lawhorn's attorney objected to the introduction of Lawhorn's second statement on 7 April because a new Miranda warning was not given; the objection was overrruled.  Id., Tab 9 at 349.  Lawhorn testified that, after the first statement on 7 April 1988, Wallis changed the tape in the recorder and told him that he "needed to tell [his] part in the story, exactly what happened and tell the truth."  Id., Tab 10a at 353-54.  Lawhorn stated that he told Wallace "that the first tape that I gave was the truth, and [Wallis] said, 'No, it was not the truth.' [Wallis] said that I needed to tell the part that I played in this . . . murder . . . and said I needed to tell the truth."  Id. at 354; see also 355-56.  Lawhorn said that Wallis was the one who told him to stop lying and to tell the truth, but that Wallace, Pope, and Talladega County Sheriff Jerry Studdard were also in the room.  Id. at 354.  Lawhorn declared that he was "frightened" and "scared to death" because they kept "questioning [him] over and over about the same thing."  Id. at 356-57.  He said that, although Wallis said that "it would be better on [Lawhorn] . . . if I would tell the truth," Wallis never provided any specific information as to how it would be better, never threatened him, and never offered or promised anything in

12

exchange for a statement.  Id. at 357, 359-61, 364.  He also conceded that he was aware of his Miranda rights when he made the statements on 7 April.  Id. at 362, 365-66.

Following one and one-half days of trial, the parties were permitted closing arguments.  During the closing argument, Fannin conceded that there was a murder and that Lawhorn had admitted shooting the victim but asked that the jury not convict Lawhorn of capital murder.  Id., Exh. Tab 12 at 458-62.  The jury, however, returned a verdict of guilty of capital murder on 26 April at 3:15 P.M. Id., Tab 15.

The penalty hearing began at 4:05 P.M. on the same day.  Id., Tab 16a. After an opening statement by the prosecutor, Fannin presented several witnesses, including Lawhorn.  Fannin asked Lawhorn his name and asked Lawhorn to make his requested statement to the jury.  Lawhorn then stated:

> Members of the jury, I know I was wrong and I want all you to know I was wrong, and I'd like to say please have mercy on me.  I want all you to know I was wrong.  I was lead and I was wrong.  I should not have did it.  I did it.  I'm sorry.  That's all I have to say.

Id., Exh. Tab 18 at 545.  Fannin asked Lawhorn no further questions, and turned him over to the prosecutor for cross-examination.  Following Lawhorn's cross-

13

examination, the prosecutor introduced the records of Lawhorn's prior convictions for burglary, theft, and possession of burglary tools. Id., Exh. Tab 19 at 575-78.

Fannin then "waive[d]" closing argument and objected "to the State making any further closing arguments." Id., Tab 21 at 584. The state responded that it had a "split" argument and that, based on Alabama Supreme Court precedent, had the right "even if he does not argue" "to open and to close." Id. Although Fannin maintained that, if he did not argue, the state had already "opened and closed," the prosecutor responded that "Fannin's position was "the law in a civil case . . . but it is not [the law] in a criminal case." Id., Tab 22 at 585. The trial court then permitted the state to present a second, rebuttal closing argument. Id.; Tab 43 at 52. During the rebuttal closing argument, the prosecutor directed the jury's attention to Lawhorn and identified him as Berry's "executioner" during "a lying-in-wait ambush" which was "as cold and calculated and as merciless . . . as you can get." Id., Tab 22 at 589, 591.

The trial court instructed the jury on the elements necessary to find aggravating circumstances involved in the crime. It explained that one aggravating circumstance, that the offense was committed for capital gain, was established by the jury's verdict of guilty of murder for hire. It then stated:

14

Another [circumstance] you could consider . . . not proven by your verdict is that the capital offense was especially he[inous], at[]rocious, or cruel, compared with other capital offenses as set out [in the statute] defining aggravating circumstances.

Id., Tab 23 at 595.

The jury proceeded to deliberations. At 7:35 P.M., the jury returned a verdict recommending that Lawhorn be sentenced to death. Id., Tab 24 at 601-02.

A presentence investigation report was prepared and filed at the 26 June 1989 sentencing hearing. Id., Tab 4 at 44. At the hearing, neither Lawhorn nor his counsel objected to any statements within the presentence investigation report, offered any other evidence, or requested a life sentence. Id., Tab 25 at 607-08. The trial court indicated that it had considered the presentence investigation report, and that "[n]othing in [it] would . . . constitute a mitigating circumstance ." Id., Tab 1 at 66-67. It found that the Lawhorn had three prior felony convictions, and that the offense was committed for pecuniary gain and was "especially heinous, atrocious, or cruel compared to other capital offenses." Id. at 67-68. The trial court then sentenced Lawhorn to death. Id., Tab 25 at 608.

Lawhorn's conviction and sentence were affirmed by the Alabama Court of Criminal Appeals, Lawhorn v. State, 581 So. 2d 1159 (Ala. Crim. App. 1990) ("Lawhorn I"), and the Alabama Supreme Court, In re Lawhorn, 581 So. 2d 1179

15

(Ala. 1991) ("Lawhorn II").[10]  On 9 September 1991, Lawhorn filed a petition for writ of certiorari with the United States Supreme Court.[11]  The petition was denied. certiorari, Lawhorn v. Alabama, 502 U.S. 970, 112 S. Ct. 445 (1991) ("Lawhorn III"), and petition for rehearing, Lawhorn v. Alabama, 502 U.S. 1050, 112 S. Ct. 919 (1992) ("Lawhorn IV").

---

[10]  On appeal, Lawhorn raised the following issues:  (1) whether the trial court erred in:  (a) denying a change of venue based on pretrial publicity; (b) failing to inquire whether the venire so favored the death penalty that they would not vote for life imprisonment without the possibility of parole; (c) denying his motion to suppress his confession because it was involuntary; (d) charging the jury that it could consider the aggravating circumstance that the murder was atrocious, cruel or heinous as compared to other capital offenses; and (e) finding no mitigating circumstances; (2) whether his death sentence was unconstitutional because the state argued that the verdict should not be based on sympathy; (3) whether the presentence report was highly prejudicial because it included a recommended sentence of death; and (4) whether he was denied a fair trial and reliable sentencing as a result of prosecutorial misconduct.  Lawhorn I, 581 So. 2d at 1164-79.

In 1990, Lawhorn filed a petition for writ of certiorari, addressing the issues raised before the Court of Criminal Appeals and "13 additional issues."  Lawhorn II, 581 So. 2d at 1180-81.  One of the raised additional issues concerned whether he was subjected to unreasonable delay in securing a judicial determination of probable cause for his warrantless arrest.  R1-17, Exh. Tab 30 at iv, 53-54.  He argued that his four days of detention before an arrest warrant was obtained unconstitutionally deprived him of his right to a fair and reliable determination of probable cause. Id.  The Alabama Supreme Court found no reversible error and addressed only one of the newly raised issues: whether the trial court erred by allowing two of the prosecutor's witnesses to sit at the prosecution's table throughout the trial.  Lawhorn II, 581 So. 2d at 1180-81.

[11]  In his petition for writ of certiorari to the United States Supreme Court, Lawhorn raised only two issues: (1) whether a state jury was permitted to find the "especially heinous, atrocious or cruel" aggravating circumstance when it had received an instruction on that circumstance and the circumstance had been rejected in two separate trials involving the same offense, and (2) whether Powers v. Ohio, 499 U.S. 400, 111 S. Ct. 1364 (1991) should be applied retroactively and thus permit Lawhorn, a white defendant, to challenge the state's exclusion of black venire members. R17-1, Exh. Tab 34 at i, 7-12.  He did not raise the issue of unreasonable delay in obtaining an arrest warrant.

16

In his appeals to the Alabama Court of Criminal Appeals and Alabama Supreme Court, Lawhorn was represented by Fannin with assistance from the Capital Resource Center in Montgomery, Alabama. R1-17, Exh. Tab 43 at 73-74, 117-18.

Lawhorn moved for postconviction relief under Alabama Rule of Criminal Procedure 32. In this motion, Lawhorn raised, inter alia, the delay in the procurement of an arrest warrant. Id., Tab 36 at 3; Tab 38 at 3. The state court held an evidentiary hearing on the motion. At the hearing, Lawhorn's court-appointed trial counsel testified. Fannin stated that, at the time of his appointment, he had been in practice for over 20 years, had tried between 150 and 200 felony jury trials, including other capital cases, and was familiar with Alabama death penalty law. Id., Tab 43 at 12, 62-63. He opined that an attorney providing effective assistance in a capital case would "investigate the case as much as possible," confer and discuss the law with the defendant and any co-counsel, and work out a strategy for both the guilt and penalty phases. Id. at 13-14. He confirmed that he obtained information, including Lawhorn's confession, from the prosecution, and that he and Giddens considered whether Lawhorn's confession could be suppressed and whether venue should be challenged based on where the crime occurred. Id. at 14-17, 24-28, 69-70, 90-97. Fannin's fee declaration

17

revealed that he spent 14.5 hours out of court preparing for trial. R1-17, Exh. Tab 43 at Exh. 2, 4. Fannin spent eight hours on 10 October 1988 investigating the county in which the crime occurred,[12] and the remaining six and one-half hours in three meetings with Lawhorn and in preparing a motion for a psychiatrist. Id. at Exh. 2 at 2. Fannin and Giddens's trial strategy was to make the state prove its case "beyond a reasonable doubt to the satisfaction of the jury." R1-17, Exh. Tab 43 at 18, 69. Fannin explained that, after researching the matter and discussing it with Lawhorn and Giddens, he made a strategic decision to waive closing arguments because he wanted to prevent the prosecutor from "inflaming the minds of the jury" by calling Lawhorn "a cold blooded murderer and back shooter." Id. at 50-51. Fannin believed that the prosecution's opportunity to make the final closing argument following a defense closing argument was foreclosed under the Alabama "rules of evidence" if the defendant waived closing argument. Id. at 51.

Giddens explained that they wanted "number one, . . . to keep [the confession] out," and that, if they were unable to do that, they needed for Lawhorn to testify that the admitted confession was not what he actually said. Id. at 96.

---

[12] The defense crime scene investigation focused on their concerns as to the specific county in which the crime occurred. This strategy was ultimately not pursued after one trial witness testified that the scene was clearly in Talladega County and legal research provided that a crime could be prosecuted if it occurred within one mile of a county line. R1-17, Exh. Tab 43 at 24-27.

Giddens commented that, once a defendant "confesses to the crime, the defense is very difficult from that point forward. It's difficult to convince the jury that [the defendant] didn't do it when he told the police he did. [T]he strategy at that point is just up in the air." Id. at 100.

Fannin, Giddens, and Matson, their investigator, spoke with a number of potential witnesses before the trial including Shirley Hudson, Lawhorn's mother; Debra Lawhorn Jones, Lawhorn's sister; Rhonda Peters, Lawhorn's juvenile probation officer and counselor; and Jerry Lawrence, Lawhorn's junior high school principal. Id. at 42-44, 50, 70, 74. Fannin remembered visiting with Hudson and Jones, but did not remember the substance of their conversation. Id. at 42-43. Although Matson's report mentioned that Lawhorn had smoked marijuana and used alcohol, Fannin and Giddens did not learn of any significant alcohol or drug use by Lawhorn from their interviews with Lawhorn, Matson's report, or discussions with the possible witnesses. Id. at 63-64, 76-77, 100. Hudson testified that, after Lawhorn and Mac were arrested, she was approached while she was at work by Berry's widow. Id. at 185-86. Berry's widow told Hudson that she was "sorry that [Lawhorn and Mac] got involved" because "she didn't feel they had anything to do with it" and that "it was all Maxine [] Walker's doings." Id. at 186-87; Tab 42 at 453. Hudson and Jones testified that they

19

visited Fannin to report this conversation to Fannin, but he did not consider it important.  Id. at 453; Tab 43 at 168-69, 187.

Jerry Lawhorn ("Jerry"), Lawhorn's brother, testified that, after Hudson divorced their father, Donald Lawhorn ("Donald"), she married George Bates.  Id. at 138.  Bates was a "a real mean fellow" who drank a lot and was physically abusive to their "mother, the kids [including Lawhorn] and anyone who came across his path."[13]  Id. at 137-41, 158.  In 1972, Bates cut Hilton Maddox "real bad" during a fight and was then shot and killed by Maddox.  Id. at 141.  Jerry said that Hudson married Maddox's brother, Howard, another "abusive alcoholic,"[14] within a year of Bates's death but divorced him about a year later.  Id. at 142-43. A few years later, Hudson began dating Randall Hudson ("Randall") and married him in 1977.  Id. at 146.  Randall was also abusive to the boys, beating them and handcuffing them to the stairs when they misbehaved.  Id. at 148-49, 151, 168. When Hudson was working or spending weekends with Randall, Lawhorn and his

---

[13]  Lawhorn also considered Bates abusive, and testified that Bates had injured Hudson to the extent that she needed stitches.  R1-17, Exh. Tab 43 at 204-06.

[14]  Jerry Lawhorn related a few episodes of abuse by Howard Maddox.  Maddox once took Jerry and Lawhorn duck hunting, and injured Jerry by hitting him across his head with a full 12-gauge shell strap as they were getting out of the truck.  R1-17, Exh. Tab 43 at 143-44.  When the hunt proved unsuccessful, Maddox blamed Jerry and Lawhorn for making too much noise and beat them.  Id. at 144.  Jerry said that, although Maddox had tried to smother him, had twisted his penis, stomped on him, and busted his chin, and occasionally beat Lawhorn, Maddox denied all such conduct.  Id. at 144-45, 150-51.  Jones added that Maddox hit and shouted at her siblings if they were around, and had sexually abused her.  Id. at 164, 169-70.

three younger siblings were cared for by their sister, Jones, who was two years older than Lawhorn.[15] Id. at 146-48, 162, 165-66.

When Lawhorn was in the eighth grade, he and Mac were sent to live with their father, Donald, in Texas because Lawhorn was tired of living with Randall and wanted to get to know Donald.[16] Id. at 151. Lawhorn enrolled in school but did not finish eighth grade. Id. at 192-99. After Donald was arrested for driving under the influence a few months later, Lawhorn lived with some of Donald's friends for about six months and occasionally attended school. Id. at 194-96. In 1981, Donald admitted that he was a chronic alcoholic and was unable to hold a job, and they moved to Georgia to live with Donald's brother and sister-in-law, Bill and Datherlene Lawhorn. Id. at 199.

After Lawhorn moved to Georgia, he lived for short periods of time with his uncle and aunt, his mother and step-father, other relatives, and his father, and occasionally attended school. Id. at 157, 199-204. In 1982, Lawhorn dropped out of school when he turned 16 years old and did not complete the ninth grade. Id. at 203. He moved into a rental trailer with his brother Jerry and another friend, and

---

[15] Jones signed Hudson's name to any school notes and reports, and their grandmother advised them not to tell anyone that they were alone to prevent child welfare intervention. Id. at 147-48, 167.

[16] Donald was married at the time, but later divorced, and Mac was soon returned to Alabama because Donald was unable to care for him. Id. at 152, 194.

attempted to support himself. Id. at 152-53, 204. Jerry testified that Lawhorn used narcotics, but was never violent towards anyone. Id. at 151, 157-59.

Lawhorn admitted that he had used drugs for years, including marijuana and narcotics such as Dilaudid. Id. at 206, 222. He said that he was "extremely high" on the afternoon of the murder. Id. at 222-23.

In 1988, Lawhorn was employed at Russell Pipe and Foundry, making $3.90 per hour. Id. at 206-07. On 31 March 1988, he cashed his paycheck and gave money to his mother pay for the preparation of his income tax return. Id. at 207-08. He expected to receive $586 as an income tax refund. Id. at 208.

Roger Appell, a Birmingham attorney who specialized in criminal law and had defended ten capital cases, testified as an expert witness. Id. at 309-12. Appell believed that Fannin provided ineffective assistance of counsel, and that his "most egregious mistake" was his failure to make a closing argument at the end of the penalty phase.[17] Id. at 315, 323. He commented that he had never waived a

---

[17] Appell believed that Fannin was ineffective in failing to advise the judge, the jury, and the district attorney of Berry's widow's contact with Hudson. Id. at 332-33. Appell also opined that, to have effectively represented Lawhorn, Fannin should have pressed for funds for a psychiatric or psychological evaluation, offered evidence of Lawhorn's drug use and Berry's widow's desire that Lawhorn not be sentenced to death, rebutted unfavorable statements in the presentence investigation at sentencing, and asked the jury and the judge not to sentence Lawhorn to death. Id. 317-20, 325-26, 329-31, 339-40, 348-50.

closing argument in a capital case and had never heard of anyone else doing so. Id. at 323-24.

The state trial court denied the postconviction motion.[18] R1-17, Exh. Tab 42. The Alabama Court of Criminal Appeals affirmed the denial, and the Alabama Supreme Court denied Lawhorn's petition for writ of certiorari. Lawhorn v. State, 756 So. 2d 971 (Ala. Crim. App. 1999), cert. denied (Ala. Jan. 7, 2000) (No. 1982018) ("Lawhorn V").[19] Lawhorn's petition for writ of certiorari to the United

---

[18] Addressing the ineffective assistance of counsel claim for failure to make a closing argument during the penalty phase, the trial court found that Fannin's

decision to waive his closing argument did not render his performance deficient because it was a strategic decision to keep the district attorney from making a closing argument. This Court has watched [the] district attorney [] on many occasions during closing argument. He is powerful and effective during closing argument. Based on this Court's experience, it is not an unusual tactical decision in Talladega County for attorneys to waive closing argument to prevent [the] district attorney [] from making a closing argument. Trial court's decision to waive closing argument is virtually unchallengeable. Trial counsel's performance was not deficient.

R1-17, Exh. Tab 41 at 420-22 (citations omitted).

[19] On appeal from the denial of his motion for postconviction relief, Lawhorn raised the following issues: (1) the trial court erred in adopting the state's proposed findings of fact and conclusions of law; and (2) ineffective assistance of counsel for (a) failing to make a claim under Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986) at trial, (b) failing to assert a claim for unconstitutional delay in obtaining the indictment, and thus a claim under County of Riverside v. McLaughlin, 500 U.S. 44, 111 S. Ct. 1661 (1991), at trial; (c) failing to lay a proper foundation for the trial court to rule that his second confession was not voluntary; (d) failing to adequately investigate Lawhorn's history of alcohol and drug use thus preventing a jury charge on involuntary intoxication; (e) failing to object to the trial court's jury instruction on reasonable doubt; (f) failing to adequately prepare Lawhorn and other witnesses for the penalty phase; (g) failing to make a closing statement at the penalty phase; (h) failing to have him examined by a psychologist; and (i) failing to object to the trial court's jury instruction regarding the aggravating circumstances that the murder was "especially heinous, atrocious, or cruel" when compared to other capital offenses; and (j) failing to adequately object and respond to the presentence investigation report. Lawhorn V, 756 So. 2d at 977-992. The Alabama Court of Criminal Appeals observed that Lawhorn had abandoned

23

States Supreme Court was denied. Lawhorn v. Alabama, 531 U.S. 835, 121 S. Ct. 93 (2000) ("Lawhorn VI").

Lawhorn filed a federal petition for writ of habeas corpus. The district court adopted the magistrate judge's report and recommendation that the petition be granted in part and denied in part, and vacated Lawhorn's conviction and sentence. The district court held, inter alia, that Lawhorn was subjected to an unconstitutional delay in the securing of a judicial determination of probable cause for his arrest and was denied effective assistance of counsel when his trial counsel failed to make a closing argument during the penalty phase. Lawhorn v. Haley, 323 F. Supp.2d 1158 (N.D. Ala. 2004) ("Lawhorn VII"). The State of Alabama

---

many of the issues that he raised in the trial court. Id. at 992-94. It also noted that several claims raised within Lawhorn's postconviction petition were procedurally barred because they "were raised and addressed at trial and/or on direct appeal," id. at 994, "could have been raised at trial and on direct appeal but were not," id. at 995, "could have been but were not raised at trial, but were addressed on appeal," id. at 996, and "although . . . not raised on appeal, they were addressed on appeal" by the Alabama Court of Criminal Appeals or the Alabama Supreme Court under a plain error review. Id. The Alabama Court of Criminal Appeals included Lawhorn's claim that he was subjected to an unconstitutional delay in the judicial determination of probable cause in the group of claims that were procedurally barred because they were not raised at trial but were addressed on appeal, and cited Lawhorn II, 581 So. 2d at 1181. Lawhorn V, 756 So. 2d at 996.

24

appealed, and moved for a stay of the judgment pending appeal.[20]  The district

court granted the motion for a stay.  R2-38 at 1.

## II.  ISSUES

1.  Whether the district court erred in refusing to apply the rule of Stone v.

Powell, 428 U.S. 465, 96 S. Ct. 3037 (1976), to bar consideration on habeas

---

[20]  Lawhorn did not cross-appeal the district court's order, and did not, therefore, seek a certificate of appealability.  He contends that a notice of cross-appeal is not necessary, and proceeds to address claims denied by the district court arguing that he is not requesting us to enlarge the relief granted by the district court.  We disagree and will not review these claims.

In a habeas proceeding, "an appeal may not be taken" absent a "certificate of appealability" indicating "which specific issue or issues satisfy the showing" "of the denial of a constitutional right."  28 U.S.C. § 2253 (a), (c)(1), (2), (3).  The only exception is for an appeal by a state or the federal government, and no certificate of probable cause is required.  Fed. R. App. 22(b)(3); State of Tex. v. Graves, 352 F.2d 514 (5th Cir. 1965) (per curiam) (adopting the reasoning of United States ex rel. Tillery v. Cavell, 294 F.2d 12 (3rd Cir. 1960) that, despite 28 U.S.C. § 2253, a certificate of probable cause was not essential to an appeal filed by a state or its representative).  In Tillery, the court examined the legislative history of § 2253 which "ma[d]e clear that petitions to the federal courts filed by persons in state custody resulting in unnecessary delay in the state proceedings was the evil sought to be remedied."  294 F.2d at 15.  It noted that "Congress was not concerned with appeal in these cases taken by a state or its representatives" and that the certificate of probable cause requirement "was plainly a device to reduce appeals from decisions in favor of states . . . not their appeals from decisions against them."  Id. at 15.  To that extent, review of additional claims would, indeed, cause additional delay.

Further, although a party may raise any argument in support of a judgment, a party who has not appealed may not bring an argument in opposition to a judgment or attack the judgment in any respect, United States v. American Ry. Express Co., 265 U.S. 425, 435-36, 44 S. Ct. 560, 564 (1924), or "hitch a ride on his adversary's notice of appeal" to "enlarge his rights under the judgment or diminish those of the opposing party."  Campbell v. Wainwright, 726 F.2d 702, 704 (11th Cir. 1984).  By failing to file a cross-appeal, Lawhorn failed to preserve these issues for appeal.  See Sikes v. Teleline, Inc., 281 F.3d 1350, 1367 n.44 (11th Cir. 2002); T.D.S., Inc. v. Shelby Mut. Ins. Co., 760 F.2d 1520, 1528 n.5 (11th Cir. 1985).  Compare Jackson v. Herring, 42 F.3d 1350, 1353 (11th Cir. 1995) (addressing petitioner's claims raised by cross-appeal from the denial of claims denied by the district court where Alabama appealed the grant of habeas relief on other claims).

We will thus not address any of Lawhorn's arguments as to any issue outside the scope of Alabama's appeal.  See Harbor Tug & Barge, Inc. v. Belcher Towing Co., 733 F.2d 823, 825 n.1 (11th Cir. 1984).

corpus of Lawhorn's Fourth Amendment claim that he was denied a prompt post-arrest determination of probable cause.

2. If Lawhorn's Fourth Amendment claim was not barred, whether the district court erred in concluding that the appropriate remedy for any Gerstein v. Pugh, 420 U.S. 103, 95 S. Ct. 854 (1975) and County of Riverside v. McLaughlin, 500 U.S. 44, 111 S. Ct. 1161 (1991) violation was the suppression of Lawhorn's confession.

3. Whether the district court erred in concluding that Lawhorn's counsel's strategic decision to waive his closing argument at sentencing was both (a) constitutionally deficient and (b) prejudicial within the meaning of Strickland v. Washington, 466 U.S. 66, 104 S. Ct. 2052 (1984).

## III. DISCUSSION

When we examine a district court's order in proceedings filed pursuant to § 2254, we review the questions of law and mixed questions of law and fact *de novo*, and the findings of fact for clear error. Stewart v. Sec'y, Dep't of Corrs, 476 F.3d 1193, 1208 (11th Cir. 2007). Under 2254, our review is, however, clearly limited and highly deferential to the decisions of the state courts. Id.; 28 U.S.C. § 2254(e)(1). State court factual determinations are "'presumed to be correct'" and the petitioner bears "'the burden of rebutting th[at] presumption . . . by clear and

26

convincing evidence.'" Marquard v. Sec'y for the Dep't of Corrs., 429 F.3d 1278, 1303 (11th Cir. 2005) (quoting § 2254(e)(1)). Habeas relief is available only in cases where the claims were adjudicated on the merits and the adjudication resulted in a decision "contrary to, or [that] involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Crowe v. Hall, 490 F.3d 840, 845 (11th Cir. 2007) (quoting 28 U.S.C. § 2254(d)).

A. Refusal to Bar Lawhorn's Fourth Amendment Claim

Alabama argues that Lawhorn's Riverside/Gerstein Fourth Amendment claim was barred from consideration on habeas review by Stone. It contends that Stone bars review of all Fourth Amendment claims and is not limited to those contesting the state courts' factual findings. It also maintains that the claim was barred because, despite the opportunity to do so, Lawhorn failed to raise the issue of his extended post-arrest detention at trial and because the claim was raised and decided by the state appellate court.

Under the Fourth Amendment, a state "must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, . . . made by a judicial officer either before or promptly after arrest."

27

Gerstein, 420 U.S. at 125, 495 S. Ct. at 868-69. In Riverside, the Supreme Court considered "the question [of] what is 'prompt' under Gerstein" and "articulate[d] more clearly the boundaries of what is permissible under the Fourth Amendment." 500 U.S. at 55, 56, 111 S. Ct. at 1169, 1170. To that intent, the Court declared that the Gerstein promptness requirement is met where (1) the probable cause determination is held within 48 hours of arrest, absent the arrested individual's demonstration of an unreasonable delay, or (2) the government shows a *bona fide* emergency, or other extraordinary circumstances delayed the determination. Id. at 56-57, 111 S. Ct. at 1670. Because Riverside set forth a "new rule for the conduct of criminal prosecutions," it is "applied retroactively to all cases . . . not yet final." Powell v. Nevada, 511 U.S. 79, 84-85, 114 S. Ct. 1280, 1283 (1994); Griffith v. Kentucky, 479 U.S. 314, 328, 107 S. Ct. 708, 716 (1987).

We are generally barred from hearing Fourth Amendment claims in a federal habeas corpus proceeding. In Stone, the Supreme Court held that

> where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

428 U.S. at 494, 96 S. Ct. at 3052.

> An "opportunity for full and fair litigation" means just that: an opportunity. If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, Stone

28

v. Powell bars federal habeas corpus consideration of that claim
whether or not the defendant employs those processes.

Caver v. State of Ala., 577 F.2d 1188, 1192 (5th Cir. 1978). "'[F]ull and fair

consideration' in the context of the Fourth Amendment includes 'at least one

evidentiary hearing in a trial court and the availability of meaningful appellate

review when there are facts in dispute, and full consideration by an appellate court

when the facts are not in dispute.'" Bradley v. Nagle, 212 F.3d 559, 565 (11th Cir.

2000) (quoting Caver, 577 F.2d at 1191). Although "sometimes 'full and fair

consideration' means consideration by two tiers of state courts[;] sometimes it

requires consideration by only one." O'Berry v. Wainwright, 546 F.2d 1204, 1213

(5th Circuit 1977).

> For a claim to be fully and fairly considered by the state courts,
> "where the facts are in dispute, full and fair consideration requires
> consideration by the fact-finding court, and at least the availability of
> meaningful appellate review by a higher state court. Where, however,
> the facts are undisputed, and there is nothing to be served by ordering
> a new evidentiary hearing, the full and fair consideration requirement
> is satisfied where the state appellate court, presented with an
> undisputed factual record, gives full consideration to defendant's
> Fourth Amendment claims."

Tukes v. Dugger, 911 F.2d 508, 513-14 (11th Cir. 1990) (quoting O'Berry, 546

F.2d at 1213). Although a defendant cannot show a Fourth Amendment violation

if "[t]he state of the law at the time of his trial did not deprive [the defendant] of

an opportunity for full and fair litigation" of his claim, Caver, 577 F.2d at 1194,

29

the situation is different if the claim did not exist at the time of his trial. Where the "particular Fourth Amendment claim did not even exist until years after [the defendant's] arrest and trial[], . . . he did not benefit from the 'opportunity for fair and full litigation' of it in [the state's] court[] to which he was entitled." Anderson v. Calderon, 232 F.3d 1053, 1068 (9th Cir. 2000). A claim argued at trial and on appeal but "ignored" by the state appellate court has not received full and fair consideration, and our consideration of it is thus not barred by Stone.[21] Agee v. White, 809 F.2d 1487, 1490 (11th Cir. 1987).

A federal court cannot grant a petition for writ of habeas corpus on claims adjudicated on the merits in the state court unless the decision was (1) "contrary to" or an "unreasonable application of" "clearly established" Supreme Court law. Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000). A decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or . . . decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Id. at 413, 120 S. Ct. at 1523.

---

[21] Where, however, the issue was presented to the state trial, intermediate appellate, and state supreme courts, each court rejected the issue, the intermediate appellate court stated that it had "carefully examined the record and determined" the merits of the issue, and a dissent from the denial of rehearing before the intermediate appellate court was written on that issue, the petitioner "cannot successfully argue that he did not receive full consideration of his claim." Swicegood v. State of Ala., 577 F.2d 1322, 1324 (5th Cir. 1978).

30

Lawhorn raised the issue of the involuntariness of his second 7 April statement in a motion to suppress filed in June 1988, in an objection during the trial, and on direct appeal. R1-17, Exh. Tab 4 at 23; R1-17, Exh. Tab 9 at 349; Lawhorn I, 581 So. 2d at 1166-68. He raised the issue again in the 1990 petition for writ of certiorari from the denial of his direct appeal when he argued that he was subjected to an unreasonable delay in the securing of a judicial determination of probable cause during his warrantless arrest. R1-17, Exh. Tab 30 at iv, 53-54. In that petition, he cited Gerstein, Baker v. McCollan, 443 U.S. 137, 99 S. Ct. 2689 (1979), and Waldrop v. State, 523 So. 2d 475 (Ala. Crim. App. 1987). The Alabama Supreme Court denied his petition for writ of certiorari on 10 May 1991, and Lawhorn filed a petition for writ of certiorari to the United States Supreme Court on 9 September 1991. In this petition, Lawhorn neither raised the issue of unreasonable delay nor cited Riverside, which had been decided by the Supreme Court on 13 May 1991.

In 1993, Lawhorn raised the issue of unreasonable delay in his state petition for postconviction relief, citing Baker, Waldrop, Riverside, and Ala. R. Crim. P. 4.3. R1-17, Exh. Tab 36 at 3; Tab 38 at 3. The state trial court and Alabama Court of Criminal Appeals each found that this claim was procedurally barred

because it could have been, but was not, raised at trial and was addressed on appeal. Id., Tab 42 at 5-6; Lawhorn V, 756 So. 2d at 996.

The magistrate judge recommended that Lawhorn's federal habeas petition be granted on this issue, noting that Lawhorn had been arrested and detained for six days before an arrest warrant was obtained. R2-22 at 15. The magistrate judge recognized that, although Alabama law required that he be arraigned within 72 hours,[22] Riverside held that a delay in obtaining a probable cause determination which "exceed[ed] 48 hours presumptively violate[d] the Fourth Amendment." R2-22 at 15. The magistrate judge noted that Lawhorn's case was not final when

---

[22] In 1988, Alabama required that a person arrested without a warrant be taken before a magistrate for a probable cause determination "without undue delay." Nicholas L. Chiarkas, Jr., Ala. Crim. Trial Practice 12 (The Harrison Co. 1988) (1981) (citing Ala. Proposed R. Crim. P. 4.3). Arrests and the determination of probable cause for a person detained without a warrant were governed by statutes and caselaw and were not addressed in the 1980 Ala. R. Crim. P. Temp. See generally Ala. R. Crim. P. Temp. (1980) (West Publ'g Co. 1989); Hugh Maddox, Ala. R. Crim. P . 197-98 (1999). In 1991, the Alabama Supreme Court adopted Rules of Criminal Procedure which required that "[a] person arrested without a warrant . . . [be] taken before a judge or magistrate without undue delay, except in no event later than seventy-two (72) hours after arrest, unless the charge for which the person was arrested is not a bailable offense." Ala. R. Crim. P. 4.3(a)(1)(iii) (1991); Maddox, supra, at 199. In 1992, following Riverside, Rule 4.3(a)(1)(iii) was amended. Id.; Ala. R. Crim. P. 4.3(a)(iii)(2003), Comm. Cmt. 1997. That rule requires that a defendant detained on a warrantless arrest receive a probable cause hearing within 48 hours. Ala. R. Crim. P. 4.3(a)(1)(iii) (1990)

Riverside was issued on 13 May 1991,[23] and that Riverside was retroactively applicable to all non-final cases. Id.

Lawhorn's conviction did not become final for retroactivity purposes until his petition for writ of certiorari to the Supreme Court was denied in November 1991. Because Riverside was decided three days after the Alabama Supreme Court denied his petition for rehearing, Lawhorn did not have an opportunity to raise the issue of a delay in the obtaining a probable cause determination which exceeded 48 hours or have it fully and fairly considered.[24] Although the issue was not clearly established at the time of the Alabama Supreme Court's denial of his direct appeal, the decisions denying the claim were contrary to Riverside and, because his case was not yet final, the law was applicable to Lawhorn. Further, the issue was clearly established when Lawhorn raised it in his Rule 32 motion for postconviction relief. The Alabama Court of Criminal Appeals erred by not revisiting the change in the law.

B. Suppression as an Appropriate Remedy

---

[23] Although the magistrate judge stated that the Supreme Court denied Lawhorn's petition for writ of certiorari in November 1990 or October 1991, the certiorari petition was actually denied on 18 November 1991. R2-22 at 15, 19 n.3; Lawhorn III, 502 U.S. 970, 112 S. Ct. 445.

[24] Because the Riverside claim was raised both at trial and on direct appeal, Lawhorn did not have an arguable claim for ineffective assistance of counsel based on his attorney's failure to argue this issue. The Alabama Court of Criminal Appeals erred by concluding that the claim was procedurally barred because it was raised for the first time on collateral appeal.

33

Alabama contends that the district court erred by adopting the magistrate judge's recommendation to suppress Lawhorn's 7 April confession as an appropriate remedy for the Riverside/Gerstein violation. It maintains that Lawhorn admitted waiving his Miranda rights knowingly and voluntarily. It argues that the temporal proximity factor must closely follow the unlawful police activity and not be separated from that activity by a significant amount of time.

The state appellate court noted that Lawhorn admitted that he initiated the 7 April conversations with Wallis, that he received and acknowledged his understanding of his Miranda warnings, and that he knew his rights under Miranda and could stop the questioning at any time. Lawhorn I, 581 So. 2d at 1167. He also admitted that he was not offered any promise or reward or threatened by Wallis, that only one person in the room was visibly armed, and that he was not handcuffed. Id. The state appellate court looked to the "totality of the circumstances" and found that Alabama had met its burden of showing the voluntariness of Lawhorn's confession with "abundant, credible" evidence. It concluded that substantial evidence showed that Lawhorn confessed after making an informed and independent choice of his own free will with the capacity to do so, and that his will was not overborne by surrounding pressures and circumstances. Id. at 1167-68.

34

The magistrate judge acknowledged that "[t]he fact that [Lawhorn] was given his <u>Miranda</u> warnings on two occasions weighs somewhat in [Alabama's] favor" but "[t]he length of Lawhorn's detention and his isolation do not" and that the "'temporal proximity' factor weighs heavily in Lawhorn's favor." R1-22 at 23 (quoting <u>Brown v. Illinois</u>, 422 U.S. 590, 603, 95 S. Ct. 2254, 2261 (1975)). The magistrate judge found that Lawhorn's confession "occurred only after he had given two exculpatory statements and after he had been in custody for five days without access to counsel" and thus "violated not only <u>Riverside</u> but also the Alabama statute which required his arraignment within 72 hours." <u>Id.</u> The magistrate judge also found that the government had failed to demonstrate any intervening circumstances, other than his extended incarceration, and that this incarceration was for "an improper purpose." <u>Id.</u> at 24.

The issue of whether suppression is an appropriate remedy for a <u>Riverside/Gerstein</u> violation is unresolved by the Supreme Court although the Supreme Court has held that exclusion is appropriate for other constitutional violations.[25] <u>See</u> <u>Powell</u>, 511 U.S. at 85 n.\*, 114 S. Ct. at 1284 n.\* ("Whether a

---

[25] The exclusionary rule is not contained in the Fourth Amendment and, because a Fourth Amendment violation occurs when there is an unlawful search or seizure, there is not a separate Fourth Amendment violation for the use of the fruits of that search or seizure. <u>Arizona v. Evans</u>, 514 U.S. 1, 10, 115 S. Ct. 1185, 1191 (1995).

Other courts have held that wrongfully seized evidence may result in exclusion of the evidence. <u>United States v. Davis</u>, 174 F.3d 941, 942, 946 n.8 (8th Cir. 1999) (affirming the

suppression remedy applies [in a Fourth Amendment violation] remains an unresolved question."). The primary benefit from use of the exclusionary rule is "the deterrence of police conduct that violates Fourth Amendment rights," and "the educative effect of the rule may dissolve" "as time passes between the moment of the [Fourth Amendment violation] and the moment of Petitioner's final collateral federal appeal years later." O'Berry, 546 F.2d at 1214 n. 16.

To determine whether or not exclusion is an appropriate remedy, the prosecution must first prove the threshold requirement of the voluntariness of any statement. Brown, 422 U.S. at 603-04, 95 S. Ct. at 2261-62. The determination of voluntariness is governed by four factors, none of which is independently dispositive: (1) whether the procedural safeguards warning prescribed by Miranda, 384 U.S. at 444-45, 86 S. Ct. at 1612 was given; (2) "[t]he temporal proximity of the arrest and the confession"; (3) "the presence of intervening circumstances," and (4) "the purpose and flagrancy of the official misconduct." Brown, 422 U.S. at 603-04, 95 S. Ct. at 2261-62. The amount of time found

---

suppression of a statement because it was obtained in violation of the Fourth Amendment, but declining to decide whether suppression was "necessarily the appropriate remedy" for such a violation as it was not addressed before the district court). See also United States v. Fullerton, 187 F.3d 587, 592 (6th Cir. 1999) (denying suppression where, despite an unreasonable delay, another remedy was available); United States v. Sholola, 124 F.3d 803, 821 (7th Cir. 1997) (reserving the issue of suppression as an appropriate remedy issue for another day where the defendant had failed to establish a Riverside violation).

sufficient to meet the temporal proximity factor ranges from immediate or "close in time," United States v. Berry, 670 F.2d 583, 588-89, 605 (11th Cir. 1982) (en banc), to three minutes, United States v. Santa, 236 F.3d 662, 677 (11th Cir. 2000), United States v. Chanthasouxat, 342 F.3d 1271, 1280 (11th Cir. 2003), to two hours, Brown, 422 U.S. at 604, 95 S. Ct. at 2262, Davis, 174 F.3d at 943. But see Anderson, 232 F.3d at 1073 (temporal proximity is met when the defendant "should already have been arraigned."). The effect of the illegal act may be "dissipated" through "a significant lapse of time" or intervening circumstance between the misconduct and the confession. Santa, 236 F.3d at 678. A significant intervening circumstance is indicated where the defendant "volunteered a desire" to talk to the law enforcement officials "soon after a lawful arrest, after advice of rights, and while his detention was plainly legal." Anderson, 232 F.3d at 1073. If law enforcement officers had sufficient evidence at the time of the defendant's arrest to support the charged offense, there is neither a Riverside violation nor the need for suppression of any subsequently obtained evidence, Sholola, 124 F.3d at 820-821. "[T]he fact that probable cause supported the initial arrest does not," however, cure a subsequent unconstitutional detention. Davis, 174 F.3d at 944.

The state appellate court reasonably concluded that Alabama presented substantial credible evidence that Lawhorn's confession was voluntary. He

37

admitted that he initiated the conversations on 7 April, received, acknowledged, and understood his <u>Miranda</u> rights and that he could stop the questioning at any time. Lawhorn has failed to show clear and convincing evidence that the state court's determination was incorrect. Lawhorn was given <u>Miranda</u> warnings on two occasions: (1) before he was initially interviewed on April 2 and (2) again when the interviewing began on April 7. He testified that he understood his rights as explained on both dates. Although there is no indication in the record that, during the five intervening days, he spoke to either anyone in his family or to an attorney, there is also no indication that he requested permission to speak to anyone. Despite Lawhorn's testimony that he was scared during that period of time and was told he would be treated better if he confessed, other testimony described Lawhorn as "in a good mood and not nervous" and four witnesses testified that no one had told Lawhorn that he would be treated better if he confessed. <u>Lawhorn I</u>, 581 So. 2d at 1167. Further, although the judicial determination of probable cause was not obtained until 8 April, the day after Lawhorn's confession, and the police continued their investigation during his

detention, Lawhorn acknowledged that the arrest warrant was based solely on

Walker's statement.[26]

Although the magistrate judge correctly determined that Lawhorn was

unlawfully detained, we do not conclude that suppression of his confession is an

appropriate remedy in light of the state appellate court's finding that Lawhorn's

confession was given as an independent and informed choice of his own free will.

C. Ineffective Assistance of Counsel

Alabama argues that the district court erred in concluding that the state

court's rejection of Lawhorn's ineffective assistance of counsel claim based on his

attorney's waiver of his closing argument during the penalty phase was objectively

---

[26] In his brief on direct appeal to the Alabama Supreme Court, Lawhorn acknowledged that "the facts available to the police to support probable cause were based solely on Walker's statement." R1-17, Exh. Tab 30 at 50. Wallis testified at trial regarding probable cause that, on 2 April 1988, Walker made a statement to Wallis and Wallace that Berry was shot by Lawhorn. Id., Tab 9 at 325-27.

During the time of Lawhorn's detention until his confession, 2 April until 7 April, the investigation into the Berry's murder continued. The investigators gathered physical evidence from the crime scene, obtained fingerprints from Lawhorn and his codefendants and from a motor vehicle, compared the fingerprints, and recovered the weapons. R1-17, Exh. Tab 9 at 152, 157, 159, 166, 169, 179, 197, 199-204, 208-09, 233-36, 252-53, 258-59, 330-32. Alabama cites United States v. Daniels, 64 F.3d 311, 314 (7th Cir. 1995) for the proposition that it is "ludicrous" "to preclude law enforcement from bolstering its case against a defendant while he awaits his Gerstein hearing." In Daniels, probable cause was established by the arresting officer's affidavit that "two . . . [bank employee] witnesses identified [the defendant bank robber] from a photo array that included [the defendant's] picture" and that "another . . . [bank customer] witness 'positively' identified [the defendant] from a photo array." Id. at 313. The investigation, which consisted of a photo line-up, continued after the preparation of the arresting officer's affidavit in support of probable cause. Id. at 313-14.

39

unreasonable. It maintains that, although Fannin's choice may seem strange, it was not strange at all because he hoped to prevail upon the judge to preclude the prosecutor from making a second rebuttal closing and because the prosecutor's initial closing argument was low-key.

The state court found that Fannin's representation was not ineffective. In response to Lawhorn's argument that Fannin had failed to research relevant law, it noted that the only evidence presented during the Rule 32 hearing regarding legal research concerned Fannin's testimony "that he found a case before trial that supported his position that the [prosecutor] could not argue if the defense waived its closing argument." R1-17, Exh. Tab 42 at 462. The state court stated that Fannin had found a supporting case "and presented it to the trial court." Id. at 462-63. It found Fannin's decision to waive closing argument not deficient because it was "a strategic decision to keep the district attorney from making a closing argument." Id. at 489. It commented that, based on its observations of the prosecutor's "powerful and effective" closing arguments, waiving closing argument was not "an unusual tactical decision in Talladega County." Id. at 489-90. It also found that Lawhorn was not prejudiced by Fannin's decision because a closing argument was not necessary to present an explanation of the mitigation evidence or a plea for mercy to the jury. Id. at 490. It concluded that "[t]his [wa]s

not a case where the jury would have accepted a plea for mercy or . . . found any mitigating evidence that outweighed the aggravating circumstances" of the offense. Id. at 491-92.

The state appellate court affirmed, finding that, "in this situation with these particular facts," a closing argument by Fannin "would have had little impact" and finding "unpersuasive" Lawhorn's claim that Fannin could have suggested the mitigating circumstance of substantial domination because such a suggestion "would have merely redirected the jury's attention to the egregious nature of this crime." Lawhorn V, 756 So. 2d at 987-88.

The district court found Alabama's objections to the magistrate judge's recommendation regarding the ineffective assistance of counsel claim "unpersuasive," adopted that portion of the recommendation, and granted relief, vacating Lawhorn's death sentence. Lawhorn VII, 323 F. Supp. 2d at 1176-77. The magistrate judge found that the state court erred in asserting that Fannin found and presented a case to the trial court which supported his position because the record showed that Fannin had neither presented nor mentioned a case to the trial court or to the jury. Id. at 1225-26. He noted that, during the Rule 32 hearing, Fannin conceded that he did not present a case to the state court, and admitted that he based his position on a reference in his personal file to Sheppard v. State, 55

41

So. 514, 515 (Ala. 1911), which he erroneously believed held that, if he rested, the prosecution would be precluded from presenting further argument. Lawhorn VII, 323 F. Supp. 2d at 1226. The magistrate judge concluded that Fannin's representation was objectively deficient, and that his failure to present a closing argument and failure to present an opening argument asking the jury for mercy or to spare Lawhorn's life, humanizing Lawhorn, and summarizing Lawhorn's position, prejudiced Lawhorn. Id. at 1226-27.

An ineffective assistance of counsel claim can be established upon a showing that the (1) "counsel's performance was deficient," and (1) "that the deficient performance prejudiced the defense" because the "errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. In a habeas corpus action, the petitioner generally carries the burden to establish both components. Atkins v. Singletary, 965 F.2d 952, 958-59 (11th Cir. 1992). The exception to the petitioner's burden lies if the circumstances of counsel's ineffective assistance "are so likely to prejudice the accused that the cost of litigating their effect . . . is unjustified." United States v. Cronic, 466 U.S. 648, 658, 104 S. Ct. 2039, 2046 (1984). Such circumstances exist in a case where "the accused is denied counsel at a critical stage of his trial . . . [or where] counsel entirely fails to subject the

42

prosecution's case to meaningful adversarial testing." Id. at 659, 104 S. Ct. at 2047. A "closing argument is a 'critical stage' of a trial." Hunter v. Moore, 304 F.3d 1066, 1070-71 (11th Cir. 2002) (quoting Cronic and holding that, regardless of prejudice, a constitutional error exists if defense counsel is denied an opportunity for closing argument).

1. Performance

To establish a constitutionally deficient performance, the defendant must "identify the acts or omissions . . . that are alleged not to have been the result of reasonable professional judgment" to "show that counsel's representation fell below an objective standard of reasonableness" and "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 687, 690, 104 S. Ct. at 2064, 2066. The "highly deferential" reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," id. at 689, 104 S. Ct. at 2065, and recognize that cases warranting the grant of habeas relief based on an ineffective assistance claim "are few and far between." Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quotation and citation omitted). The unreasonable performance must have been such that "*no competent counsel would have taken the action that [the petitioner's] counsel did take*." Grayson v. Thompson, 257 F.3d 1194, 1216

43

(11th Cir. 2001). "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Our interest lies in determining "whether the adversarial process . . . worked adequately" and not in "grading [the] lawyers' performance[.]" Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Because "it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight," Bell v. Cone, 535 U.S. 685, 702, 122 S. Ct. 1843, 1854 (2002), we must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065.

In reviewing an ineffective assistance claim brought under 28 U.S.C. § 2254, the petitioner must not only establish that the state court applied Strickland incorrectly, but also that the state court "applied Strickland to the facts of his case in a objectively unreasonable manner." Bell, 535 U.S. at 699, 122 S. Ct. at 1852.

In Alabama, if a criminal defendant's attorney declines to make a closing argument, the trial judge has the discretion to permit or deny the prosecution a closing argument. Sheppard, 55 So. at 515. See also Floyd v. State, 571 So. 2d 1221, 1227 (Ala. Crim. App. 1989), rev'd on other grounds, Ex parte Floyd, 571

44

So. 2d 1234 (1990) (counsel's strategic decision to waive closing argument succeeded in depriving the prosecution of its second closing argument).

A determination as to whether the request for the use of this discretion in a capital case constitutes a constitutionally deficient performance requires a review of the circumstances. In Bell, the Supreme Court held that it was not objectively unreasonable for a defense counsel to waive a final argument at sentencing which could have reprised his earlier summation of the mitigating evidence and his plea for life to prevent the "very persuasive" prosecutor from "depict[ing] his client as a heartless killer just before the jurors began their deliberation." 535 U.S. at 701, 702, 122 S. Ct. at 1854. In Bell, however, the defense attorney had made an opening statement at sentencing a few hours earlier discussing the mitigating evidence and urging a plea for life, the prosecution did not put on any dramatic or impressive testimony during the sentencing hearing, the prosecution delivered a fact-based closing that did not dwell on any of the brutal aspects of the crime, and the waiver prevented the prosecutor's closing argument. Id. at 701-02, 122 S. Ct. at 1854. Also see Messer v. Kemp, 760 F.2d 1080, 1090 (11th Cir. 1985) (trial counsel's failure to make an opening statement during the guilt phase was not ineffective when "he accomplished during voir dire what most attorneys set out to do in their opening remarks," was consistent with "his strategy . . . to use a low-

45

key approach, maintain credibility with the jury, and to present the human side of his client during the sentencing phase," and there was "no evidence" which he could have presented to further the defense); Lightbourne v. Dugger, 829 F.2d 1012, 1025-26 (11th Cir. 1987) (per curiam) (trial counsel's failure to present all available mitigating evidence at sentencing was not ineffective "[g]iven the circumstances of th[e] case" when counsel conducted an investigation into his client's background, focused on his client's lack of a significant criminal record, argued against the wisdom of the death penalty, and when most of the mitigating evidence was presented in the presentence investigation report which was considered by the trial judge before sentencing); Floyd, 571 So.2d at 1227 (counsel's strategic decision to waive closing argument was "unchallengeable" where the prosecution's initial closing argument was "very brief" and unemotional, and defense counsel anticipated that "the prosecution was saving its persuasive argument for last.")

Deficient performance is demonstrated by an attorney's failure to use the closing argument to focus the jury's attention on his client's character or any mitigating factors of the offender's circumstances, and by his failure to ask the jury to spare his client's life. Dobbs v. Turpin, 142 F.3d 1383, 1389 (11th Cir. 1998).

The issue of whether counsel's tactical decision was reasonable is a question of law that we review *de novo*. Hardwick v. Crosby, 320 F.3d 1127, 1158, 1163 (11th Cir. 2003). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. Crawford v. Head, 311 F.3d 1288, 1298 (11th Cir. 2002) (quoting Strickland, 466 U.S. at 690-91, 104 S. Ct. 2066). "One of the primary duties defense counsel owes to his client is the duty to prepare himself adequately prior" to a legal proceeding. Magill v. Dugger, 824 F.2d 879, 886 (11th Cir. 1987). Such preparation includes an understanding of the legal procedures and the legal significance of tactical decisions within those proceedings. Young v. Zant, 677 F.2d 792, 794, 799-800 (11th Cir. 1982) (an attorney's reliance on former law and unawareness of procedure deprived his client of effective assistance). Tactical or strategic decisions based on a misunderstanding of the law are unreasonable. Hardwick, 320 F.3d at 1163; see also Horton v. Zant, 941 F.2d 1449, 1462, 1463 (11th Cir. 1991) (counsel's "tactical decision" to present no mitigating evidence during the sentencing phase was "unreasonable" when it was based on a misinterpretation of the law and the

47

failure to evaluate alternative paths); <u>Jackson</u>, 42 F.3d at 1367-68 (counsel's strategic decision was not reasonable as it was "unsupported by sufficient investigation" and information "of the available options").

Fannin's performance was unreasonably deficient. His decision was not made after a thorough investigation of the law but was made based on a gross misunderstanding of a clear rule of Alabama criminal procedure. His decision to waive closing argument was unreasonable because it was based on a complete misunderstanding of a clear rule of law. The deficient performance is not only Fannin's decision to waive closing argument but also his failure to conduct adequate legal research in support of that decision. Viewing the facts of the case at the time of his decision, "no competent counsel" would have made such a mistake in his legal research in deciding to waive closing argument.[27] <u>See</u> <u>Grayson</u>, 257 F.3d at 1216. He failed to adequately investigate or research the law and was thus unable to make a strategic decision as to whether to waive argument

---

[27] The state trial court's comment that it was "not an unusual tactical decision in Talladega County for attorneys to waive closing argument to prevent [the] district attorney . . . from making a closing argument" is unsupported by the record. R1-17, Exh. Tab 42 at 489-90. There is nothing in the statement that indicates that the attorneys waiving closing arguments did so based on a mistaken understanding of the law. These attorneys may have known the law and taken a calculated risk, based on the specific factual situation in their cases, to waive their clients' right to close. The record does not reflect any of the facts in those referenced cases or even whether they were death penalty cases where closing argument during the penalty phase plays a different role than it does in the adjudication of guilt or innocence.

48

or to lessen the prosecution's closing argument by an alternative means. It is the combination of those acts that make his representation constitutionally deficient.

2. Prejudice

Once a constitutionally deficient performance is established, the petitioner must also show prejudice. He must, specifically, "show that there is a reasonable probability that . . . the result of the [sentencing] proceeding would have been different," Strickland, 466 U.S. at 694, 104 S. Ct. at 2068, "if competent counsel had presented and explained the significance of all the available evidence." Williams, 529 U.S. at 399, 120 S. Ct. at 1516. Our determination is based on a review of "the entire postconviction record . . . as a whole" and with consideration of all cumulative evidence. Id. at 399, 120 S. Ct. at 1516.

We are aware that "some [death penalty] cases almost certainly cannot be won by defendants" because "sometimes the *best* lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder–or, even a less brutal murder[–]for which there is strong evidence of guilt in fact." Clisby v. State of Alabama, 26 F.3d 1054, 1057 (11th Cir. 1994). Because one of the most important functions of the capital sentencing process is the opportunity to humanize the defendant, the importance of the defense's closing argument cannot, therefore, be overstated. Marshall v. Hendricks, 307 F.3d 36,

49

99, 103 (3rd Cir. 2002) ("The penalty phase focuses "on the production of evidence to make a case for life" humanizing the defendant by showing "the meaning and value of the defendant's life" and "worthiness to live."); see also Hardwick, 320 F.3d at 1163 (citing Marshall).  Through closing argument, counsel has one "last clear chance" or final opportunity to marshal all of the mitigating evidence before the jury and explain or minimize the prosecution's evidence. Herring v. New York, 422 U.S. 853, 862, 95 S. Ct. 2550, 2555 (1975).  Even in cases were the factual background is easily understood, closing argument by the defense can remind the factfinder of favorable facts that it may have forgotten or mistakenly downplayed or prematurely misjudged, and help prevent an erroneous verdict.  Id. at 863, 95 S. Ct. at 2556.

During the trial and sentencing, the jury heard the shocking evidence of the crime:  that Lawhorn shot Berry after Berry had fallen and become entangled in vines and underbrush, and with the intent of insuring that Berry was dead.  During his opening argument during the penalty phase, Fannin outlined the four mitigating factors that he thought the evidence would establish:  (1) Lawhorn lacked a "significant history of violent acts"; (2) Lawhorn acted under "extreme duress or . . . the substantial domination of another person"; (3) Lawhorn was relatively young at the time of the offense; and (4) Lawhorn had a good character.

50

R1-17, Exh. Tab 17 at 498-500. He advised the jury that they could consider "any evidence in mitigation" "which would entitle [Lawhorn] to life without parole instead of the death penalty." Id. at 499. He requested that the jury "come back on a recommendation of life without parole." Id. at 501.

If he had presented a closing argument, Fannin could have refreshed the jury's memory of the evidence of substantial domination presented during the guilt phase. The evidence of Walker's substantial domination of Lawhorn at the time of the offense was significant: Lawhorn's confession indicated that, during the days preceding the murder, Lawhorn was living with Walker, that she was frightened of Berry, and that she persisted in her requests for Lawhorn to kill Berry. Fannin could have also argued for the mitigation of Lawhorn's age at the time of the offense and his troubled family background.

Even without a closing argument, one juror voted to recommend life instead of death. R1-17, Exh. Tab 4 at 39. In Alabama, a jury was required to have a vote of at least 10-2 to recommend a death sentence; a vote of at least 7-5 was required for a recommendation of life without parole.[28] Ala. Code § 13A-5-46(f).

---

[28] "If the jury is unable to reach an advisory verdict recommending a sentence, or for other manifest necessity, the trial court may declare a mistrial of the sentence hearing." Ala. Code § 13A-05-46(g). Following such a mistrial, a second sentencing hearing "shall be conducted before another jury" for an advisory verdict or the parties may consent to waive a jury advisory verdict and submit to a trial court sentence. Id.

Thus, Fannin needed only to convince two other jurors to alter the outcome of the proceedings.[29] Fannin, however, surrendered his "last clear chance" to set forth any facts during his opening argument which would have summarized Lawhorn's position or humanized Lawhorn, and failed to ask the jury for mercy or to spare Lawhorn's life. See Herring, 422 U.S. at 862, 95 S. Ct. at 2555; Lawhorn I, 581 So. 2d at 1174, 1177.[30] Fannin's failure to present a closing argument prejudiced Lawhorn because there is a reasonable probability that, but for his unprofessional error, the result of the sentencing proceeding would have been different.

## IV. CONCLUSION

We do not find that Lawhorn has rebutted the presumption of correctness that the judgment of the Court of Criminal Appeals finding that Lawhorn's confession was voluntarily given. We do find that Lawhorn has demonstrated that

---

[29] Lawhorn's co-defendant and brother, Mac, was also charged with murdering Berry pursuant to a contract for hire. Lawhorn, 574 So. 2d at 971. During the guilt phase, the jury heard Mac's confession to, arguably, less shocking conduct than Lawhorn's. Id. at 973-74. During the penalty phase, Mac's counsel presented closing argument and different mitigating evidence. Id. at 971. The jury recommended life imprisonment without parole. Id.

[30] The Alabama Court of Criminal Appeals noted that the "unconflicting" evidence was "overwhelming" that Lawhorn

directly participated in a conscienceless, pitiless, and torturous murder. Berry's last minutes were obviously filled with terror, fear, and knowledge that his death was imminent, and he experienced a high degree of prolonged pain before his death. All of this was accomplished by [Lawhorn] with complete indifference–complete indifference to Berry's pain and terror and complete indifference to the value of human life, which he found to be worth $50."

Lawhorn I, 581 So. 2d at 1177.

52

the state court decision finding that his counsel's waiver of closing argument during the penalty phase was "contrary to" clearly established federal law.  We reverse the district court's judgment granting Lawhorn relief by suppressing his confession but affirm the district court's granting of relief on the issue of the waiver of closing argument during the penalty phase.

**REVERSE in part and AFFIRMED in part.**

BARKETT, Circuit Judge, CONCURRING:

I concur in Judge Birch's opinion and also believe there were other instances of ineffective counsel that would warrant a new sentencing hearing.